Charles MORENO, Plaintiff–Appellant, Cross–Appellee,

v.

CONSOLIDATED RAIL CORPORATION, Defendant–Appellee, Cross–Appellant.

Nos. 94–1231, 94–1247.

United States Court of Appeals, Sixth Circuit.

Reargued June 12, 1996.

Decided Nov. 4, 1996.

---

Michael D. Burwell (reargued and re-briefed), William T. Nahikian, Burwell & Nahikian, Bloomfield Hills, MI, for Charles Moreno.

Robert C. Ludolph (reargued and re-briefed), Judith E. Caliman, Pepper, Hamilton & Scheetz, Detroit, MI, for Consolidated Rail Corp.

Before: MARTIN, Chief Judge; MERRITT, KENNEDY, NELSON, RYAN, BOGGS, NORRIS, SUHRHEINRICH, SILER, BATCHELDER, DAUGHTREY, MOORE, and COLE, Circuit Judges.

NELSON, J., delivered the opinion of the court, in which MERRITT, KENNEDY, BOGGS, NORRIS, SUHRHEINRICH, SILER, BATCHELDER and COLE, JJ., joined. RYAN, J. (p. 793), delivered a separate concurring opinion. MARTIN, C.J. (p. 793), and DAUGHTREY, J. (pp. 793–95), delivered separate opinions concurring in part and dissenting in part, with Chief Judge MARTIN and Judge MOORE also joining in Judge DAUGHTREY's opinion.

DAVID A. NELSON, Circuit Judge.

Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, prohibits discrimination against certain handicapped individuals "under any program or activity receiving Federal financial assistance...." Defendant Consolidated Rail Corporation ("Conrail") accepts federal funds for its railroad crossing improvements, and the first question presented in this appeal is whether Conrail thereby subjects itself to the prohibitions of § 504. As did the district court, we shall answer this question "yes."

Finding that Conrail intentionally discriminated against plaintiff Charles Moreno in violation of § 504, a jury awarded Mr. Moreno compensatory damages exceeding $185,-000 and punitive damages exceeding $1.3 million. Congress had previously authorized recovery of punitive damages for malicious or recklessly indifferent violations of a different section of the Rehabilitation Act, § 501, but punitive damages awarded under § 501 are subject to a statutory cap of not more than $300,000. See 42 U.S.C. § 1981a. Congress has never expressly authorized the recovery of monetary damages of any sort for violations of § 504, but federal courts have long held that compensatory damages may be awarded for such violations. Not until 1994—more than two decades after enactment of the Rehabilitation Act—did a single United States district court permit an award of punitive damages for a violation of § 504. With the exception of a three-judge panel of this court in the case at bar, no appellate court has ever held that punitive damages may be recovered for a violation of § 504.

The district court declined to let the jury's punitive damage award stand in the instant case, notwithstanding that federal courts generally have the power to grant "any appropriate relief in a cognizable cause of action brought pursuant to a federal statute." See *Franklin v. Gwinnett County Public Schools,* 503 U.S. 60, 70–71, 112 S.Ct. 1028, 1035, 117 L.Ed.2d 208 (1992). The propriety of the district court's decision not to allow punitive damages is the second question presented for review here.

We agree with the district court that under the Rehabilitation Act in its present form, punitive damages are not recoverable for violations of § 504. The judgment of the district court will be affirmed as to both of the points at issue in this appeal.

I

On December 24, 1991, plaintiff Moreno received a letter from Conrail, his employer of 36 years, removing him from his position as a car inspector foreman. As the reason for this adverse action, the letter cited work restrictions that included avoidance of irregular meal breaks and irregular shifts. The restrictions had been imposed a few days earlier when a company doctor learned, on reviewing Mr. Moreno's medical records in connection with a return to work following surgery for carpal tunnel syndrome, that Mr. Moreno suffered from diabetes mellitus. He had first been diagnosed with diabetes 13 years earlier, but had been able to control the condition with medication. There is no indication that the disease ever interfered with his job performance.

Alleging a violation of § 504, Mr. Moreno brought suit against Conrail in the United States District Court for the Eastern District of Michigan. Conrail moved for summary judgment on the ground that it was not a recipient of federal financial assistance and was thus not subject to the Rehabilitation Act. Following an evidentiary hearing, the district court (Duggan, J.) issued an unpublished opinion and order denying Conrail's motion.

The case was tried to a jury of seven, defense motions for a directed verdict were denied by the court, and the jury returned a verdict for the plaintiff. The jury assessed

damages of $62,536 for lost wages and benefits,[1] $125,000 for emotional distress, and $1,312,752 in punitive damages. The district court entered judgment on the verdict, but subsequently granted a motion for judgment *n.o.v.* (now known as a "renewed motion for a judgment as a matter of law") with respect to the punitive damage award. See *Moreno v. Consolidated Rail Corp.*, 909 F.Supp. 480, 488–89 (E.D.Mich.1994). A timely appeal and cross-appeal followed.

A three-judge panel of this court affirmed the district court's ruling on Conrail's receipt of federal financial assistance, but reversed the striking of the punitive damage award. See 63 F.3d 1404 (6th Cir.1995). A majority of the active judges of this court then voted to rehear the case *en banc,* thereby vacating the action taken by the panel. See 70 F.3d 433 (6th Cir.1995). The case has now been briefed and argued before the full court, and the matter is ready for our decision.

## II

Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, ... be subjected to discrimination under any program or activity receiving Federal financial assistance...." 29 U.S.C. § 794(a). We turn first to the question of whether Conrail received such assistance.

Under a program first established by the Federal–Aid Highways Act of 1944 ("FAHA") and continued by a successor statute, the Intermodal Surface Transportation Efficiency Act of 1991, the federal government appropriates funds for use by the states in "the elimination of hazards of railway-highway crossings." 23 U.S.C. § 130(a). These funds are allocated to the several states on the basis of a statutory formula. See *id.* § 130(f).

Railroad crossings are subject to regulation by both state and federal authorities. Congress has granted the Secretary of Transportation authority to promulgate federal railroad safety regulations, including regulations concerning grade crossings. 49 U.S.C. § 20103. (Prior to 1994 the Secretary's authority was codified at 45 U.S.C. §§ 431, 433.) States may adopt their own regulations or continue state regulations in force until the Secretary issues a federal regulation on the subject, and states may keep in place more stringent regulations that do not conflict with federal regulations and do not unduly burden interstate commerce. 49 U.S.C. § 20106, previously 45 U.S.C. § 434. Pursuant to the Highway Safety Act of 1973, each state makes regular inspections of railroad crossings and develops a schedule for necessary improvements. 23 U.S.C. § 130(d).

Where federal funds are spent to upgrade a railroad crossing, the FAHA provides that the Secretary may require the railroad to pay the United States a percentage of the construction cost deemed to represent the "net benefit" to the railroad. *Id.* § 130(b) and (c). Section 130(b) provides that this percentage may not exceed ten percent of the cost. The implementing regulations further limit the amounts that railroads are required to pay, providing in many cases that there shall be no payment at all. Projects classified as "grade crossing improvements" and projects for "reconstruction of existing grade separations," for example, are generally deemed to be of "no ascertainable net benefit to the railroad," and the railroads are generally not required to share in their cost. 23 CFR § 646.210(b)(1) & (2). In the case of "projects for the elimination of existing grade crossings at which active warning devices are in place or ordered to be installed by a State regulatory agency," the railroad bears only five percent of the cost. *Id.* § 646.210(b)(3).

The evidentiary hearing conducted by the district court in this case provided clarification of how the process works in Michigan. Clarence Magoon, a former official of the Railroad Safety and Tariffs Division of the Michigan Department of Transportation ("MDOT"), explained that the MDOT undertakes a biennial safety-oriented review of each railroad crossing in the state. Where the review shows that improvements are warranted, and pursuant to various administrative procedures allowing for public com-

---

1. Pursuant to stipulation, $24,388 was later offset against this award.

ment and for objection from the railroad that owns the property, the MDOT issues orders to the railroad requiring that the improvements be made. The sole criterion for the issuance of such orders, Mr. Magoon testified, is safety; the orders are in no way dependent upon the availability of federal funding.

Larry Tibbits, a current MDOT official, elaborated on the process by which railroad crossing improvements are federally funded. Once the Safety Division issues regulatory orders, Mr. Tibbits explained, a different arm of the MDOT prioritizes eligible projects and contacts the railroad and the local highway authority to ascertain what role they will play in the actual construction. The state then engineers the project and prepares cost estimates. Each individual project must be approved by the federal government. The railroad and the state are required by the federal government to enter into an agreement in which the railroad undertakes to make the necessary improvements. Generally, Mr. Tibbits explained, the railroad makes the improvements itself, although in some cases it may hire a contractor. The state then uses federal funds to reimburse the railroad for its costs. See generally 23 C.F.R. § 140.900–922, where the reimbursement procedure is set forth in detail.

Mr. Tibbits confirmed important parts of Mr. Magoon's testimony, stating that to his knowledge Conrail owns all of the property on which its rails are located; that the issuance of regulatory orders has "nothing to do [with the availability of] federal funds;" and that Conrail owns the improvements— "[f]lashing light signals, gates, crossing surface and ... any of the circuitry involved"— made to the crossings. Both Mr. Tibbits and Mr. Magoon explained that if federal funds are not available for an improvement ordered by the state at a grade-crossing, the allocation of expenses depends on the type of project; the railroad must bear all the cost of repairing rough crossing surfaces and all of the cost of installing gates, whereas the cost of installing flashing light signals is borne equally by the railroad and the highway or road authority.

The relationship described by Mr. Magoon and Mr. Tibbits is outlined in a "Master Agreement for Railway–Highway Grade Crossing Improvements on Public Highways," entered into between Conrail and the Michigan State Highway Commission on December 21, 1978. The Master Agreement provides that each project involving federal funds must receive approval from the Federal Highway Administration before any work is started; that Conrail "will bear the full cost of any items for which [it is] responsible and which are determined to be not properly a part of a Project;" and that unless the parties agree otherwise, after the installation of traffic-control devices, crossing surfaces or other improvements, the railroad will "own and operate" the improvement.

The Agreement contemplates that Conrail will be subject to federal anti-discrimination laws applicable to entities receiving federal financial assistance. In addition to mandating compliance with Department of Transportation regulations implementing Title VI of the Civil Rights Act of 1964,[2] the Agreement incorporates an appendix (Appendix B) that explicitly obligates Conrail to "comply with the Regulations relative to nondiscrimination in Federally assisted programs of the Department of Transportation . . . ."

A December 1982 amendment to the Agreement substitutes MDOT for the Highway Commission, makes clear that the Agreement "shall apply only to improvements which are federally funded," and states that "it is the desire of the parties to obtain federal funding when possible." The amendment makes no change in Appendix B, leaving intact the provision requiring compliance with the nondiscrimination regulations for federally assisted programs.

### III

■ Conrail acknowledges that it receives government money for the improvement of railroad crossings. Conrail does not deny

---

**2.** As explained more fully in the next part of this opinion, handicapped individuals who work for recipients of federal financial assistance have been given the "remedies, procedures, and rights" set forth in Title VI of the Civil Rights Act of 1964.

that it owns the capital improvements paid for with these funds, and it does not deny that the relevant improvement orders are issued to it without regard to the availability of federal funds. But notwithstanding that the federal government has paid for an obligation that Conrail would otherwise have had to pay out of its own funds, subject in some cases to an equal sharing of costs with local public authorities, Conrail insists that it is not the recipient of federal financial assistance.

Conrail argues that it does not "receive" federal funds, technically, because the federal government distributes the money to the State of Michigan and Conrail is at most an indirect beneficiary; that the purpose of the federal statute under which Michigan receives the funds was to promote public safety and serve the needs of commerce, not to subsidize railroads; that paying a railroad the fair market value of construction services rendered by the railroad cannot be equated with providing financial assistance to the railroad; and that Conrail receives no benefit for which it does not reimburse the state, Congress having determined that the benefit to the railroad cannot exceed 10 percent of the cost of the improvements and provision having been made for reimbursement by Conrail of amounts not exceeding 10 percent of the costs.

■ We do not find Conrail's arguments persuasive. It is true that in *United States Dep't of Transp. v. Paralyzed Veterans of America*, 477 U.S. 597, 106 S.Ct. 2705, 91 L.Ed.2d 494 (1986), the case on which Conrail relies most heavily, the Supreme Court held that commercial airlines which were indirect beneficiaries of federal funding of airports and of the air traffic control system had not been "receiving" federal financial assistance within the meaning of § 504. But there it was the United States itself which "owned and operated" the air traffic control system, *id.* at 612, 106 S.Ct. at 2714, while not a single penny of airport assistance had been given to the airlines; "Congress [had] made it explicitly clear that [airport] funds [were] to go to airport operators." *Id.* at 605, 106 S.Ct. at 2711. An altogether different situation is presented in the case at bar.

Here it is Conrail that owns and operates the railroad crossing improvements, and it is Conrail that ultimately receives the money for the improvements. The entity that receives the money, *Paralyzed Veterans* teaches, is the "recipient." *Id.* at 607 n. 11, 106 S.Ct. at 2712 n. 11.

It makes no difference, in our view, that the federal funds of which Conrail is the recipient come to it through the State of Michigan rather than being paid to it by the United States directly. See *Grove City College v. Bell*, 465 U.S. 555, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984) (holding that a college was the recipient of federal financial assistance when its students received educational grants for payment of college tuition). And see 45 C.F.R. § 84.3(f), a Department of Health and Human Services regulation defining "recipient," for Rehabilitation Act purposes, as "any state ... or any person to which Federal financial assistance is extended directly or through another recipient , ..., but excluding the ultimate beneficiary of the assistance." The ultimate beneficiaries of the federal funds at issue in the case before us are the members of the traveling public, just as the ultimate beneficiaries in the funds at issue in *Grove City* were the students— but Conrail, like the college, is clearly a "recipient" of federal funds.

It is equally clear, we believe, that what Conrail receives is "financial assistance"—as Conrail itself presumably recognized when it signed a Master Agreement with an appendix containing an express promise to comply with the nondiscrimination regulations for federally assisted programs. Without the federal grade-crossing program, Conrail itself would have to pay 50 percent or 100 percent of the full cost of the improvements; with the federal program, Conrail has to pay less than 10 percent of the cost. Congress may not have chosen to say in so many words that it was subsidizing Conrail and other railroads, but actions sometimes speak louder than words—and Congress was certainly not unaware of the assistance the railroads were receiving. *Cf. Grove City*, 465 U.S. at 565–66, 104 S.Ct. at 1217–18, where the Court stressed that the legislative history of the Education Amendments of 1972 was "replete

with statements evincing Congress' awareness that the student assistance programs ... would significantly aid colleges and universities." In the matter before us here, the statute itself is replete with language evincing Congress' awareness that the railroads would not have to pay more than 10 percent of the cost of the improvements. See 23 U.S.C. § 130.

■ The argument that Conrail merely receives the money as a *quid pro quo* for its services as a contractor will not wash, in our opinion. It is true that Conrail is paid for constructing the improvements, but Conrail also owns the improvements. One can obviously be the recipient of federal financial assistance in kind, see *Paralyzed Veterans,* 477 U.S. at 607 n. 11, 106 S.Ct. at 2712 n. 11, and the result is the same whether we think of Conrail as a recipient of dollars or as a recipient of flashers, gates, and the like.

■ Its ownership of the improvements has no significance, Conrail contends, because the percentage of the improvements' costs that is "deemed to represent the net benefit to the railroad" cannot exceed 10 percent, under 23 U.S.C. § 130(b), and the railroad itself bears an appropriate percentage of the cost as determined by the Secretary of Transportation. The statutory scheme, in Conrail's submission, creates a conclusive presumption that Conrail receives no net benefit.

But Conrail is perfectly free not to accept federal funding at all. This is significant, *Paralyzed Veterans* suggests, Congress having limited the application of § 504 to recipients of "federal financial assistance" for the reason that "it sought to impose § 504 coverage as a form of contractual cost of the recipient's agreement to accept the federal funds." *Paralyzed Veterans,* 477 U.S. at 605, 106 S.Ct. at 2711. Airlines cannot choose to reject federal funding received by the owners of airports, but Conrail can certainly reject federal funding for its crossing improvements. The reason it does not reject such funding, of course, is that substantially more than 10 percent of the cost would have to be borne by Conrail itself were it to turn down the federal money.

The fact that the percentage of the construction costs "deemed" to represent the net benefit to the railroad may be set by the Secretary of Transportation anywhere in the range between zero and 10 percent certainly does not mean that the benefit is deemed to be limited to this range for purposes of determining whether the railroad receives federal financial assistance. On the contrary, the statute explicitly says that the purpose of the percentage-setting exercise is to "determin[e] the railroad's share of the cost of construction," which share "shall in no case exceed 10 per centum." 23 U.S.C. § 130(b). And by setting the railroad's share far below the share that the railroad would have to pay without the federal funding, Congress was obviously providing for federal "assistance" to the railroads—just as the Master Agreement suggests.

As Judge Duggan summed the matter up,
"the railroad companies receive federal funds to reconstruct or rehabilitate crossings that they are under a duty to maintain. This is unquestionably a benefit to the railroads who own the rails in need of repair. The funds go directly to the railroad to pay for improvements that they would otherwise have to pay for themselves." Slip opinion of 8/23/93 at 11–12.

If this is not "federal financial assistance," the term is simply devoid of any normal meaning.

IV

■ We turn now to the question of whether punitive damages may be awarded under § 504 of the Rehabilitation Act. Congress did not explicitly provide for punitive damages under this section; in fact, § 504 does not even provide explicitly for a private cause of action. Section 505 of the Rehabilitation Act, added by Congress in 1978, does say that "[t]he remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964" shall be available to persons aggrieved under § 504. 29 U.S.C. § 794a(a)(2). But Title VI of the Civil Rights Act, like § 504 of the Rehabilitation Act, is silent as to the availability of a private cause of action and private remedies.

This court, like most other circuits, has concluded that a private cause of action to redress violations of § 504 exists by implication. See *Hall v. United States Postal Service*, 857 F.2d 1073, 1077–78 (6th Cir.1988). And in 1984 (11 years after the passage of § 504), the Supreme Court—answering a question upon which there had been considerable uncertainty among the circuit courts—held that at least "equitable action[s] for backpay" were allowed for intentional discrimination under § 504. *Consolidated Rail Corp. v. Darrone*, 465 U.S. 624, 630, 104 S.Ct. 1248, 1252, 79 L.Ed.2d 568 (1984). The unresolved issue that remained after *Darrone* was the availability of other monetary remedies.

In *Franklin v. Gwinnett County Pub. Schs.*, 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992), the Supreme Court determined that compensatory damages were available under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–1688—a statute with language similar to that in § 504, and for which no private cause of action was expressly provided. Every circuit that has reached the issue after *Franklin* has held that compensatory damages are available under § 504. See *W.B. v. Matula*, 67 F.3d 484, 494 (3d Cir.1995); *Pandazides v. Virginia Bd. of Educ.*, 13 F.3d 823 (4th Cir. 1994); *Rodgers v. Magnet Cove Pub. Schs.*, 34 F.3d 642, 645 (8th Cir.1994); *Waldrop v. Southern Co. Servs., Inc.*, 24 F.3d 152, 157 n. 5 (11th Cir.1994). No appellate court other than the Sixth Circuit has ever held that punitive damages are available under § 504, however.

The availability of punitive damages was not at issue in *Franklin*.[3] The *Franklin* Court did, however, refer to the "general rule" under which, "absent clear direction to the contrary by Congress, the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute." 503 U.S. at 70–71, 112 S.Ct. at 1035; see also *Lane v.*

*Pena,* —— U.S. ——, 116 S.Ct. 2092, 135 L.Ed.2d 486 (1996).

■ Under one possible interpretation, *Franklin* invites us to engage in a two-part inquiry here. First, we are invited to determine whether there is any clear indication of congressional intent to limit the presumption in favor of any and all appropriate damage remedies; second, absent any such indication, we are invited to determine whether the remedy in question is "appropriate." See *CSX Transp. Inc. v. Marquar,* 980 F.2d 359 (6th Cir.1992). We shall use this analytical approach out of an abundance of caution, although we are by no means sure that its use is mandatory where punitive damages, as opposed to compensatory remedies, are at issue, or where statutory sanctions have been provided, as they have been for violations of § 504.

### A.

In this case, as in *Franklin*, the usual sources of legislative history—contemporaneous committee reports, floor debates and the like—are of little help, the cause of action having been created by the courts and not by Congress. We therefore turn, as did the *Franklin* Court, to subsequent congressional actions.

Between 1986 and 1991 Congress amended the Rehabilitation Act three times. To understand the significance of these amendments, it is important to understand something of the background against which Congress was legislating.

After *Darrone* (in 1984) and before *Franklin* (in 1992), lower courts were divided on whether tort-style damages, such as compensatory damages for pain, suffering, and emotional distress, were available under § 504. Compare *Eastman v. Virginia Polytechnic Inst. & State University,* 939 F.2d 204, 209 (4th Cir.1991) (concluding that § 504 permits neither compensatory damages for pain and suffering nor punitive damages) with *Kling v.*

---

3. The question before the Court concerned the availability of "monetary damages" generally; "punitive damages" were never mentioned. And throughout the *Franklin* opinion the Court consistently speaks in a compensatory vein—making "good the wrong done" (*id.* at 66, 112 S.Ct. at

1033), "redress[ing] injuries" (*id.*), "remedial relief" (*id.* at 68, 112 S.Ct. at 1034), and the like. Thus it is by no means clear that *Franklin* has more than peripheral relevance to the case at bar.

*County of Los Angeles,* 769 F.2d 532, 534 (9th Cir.) (allowing compensatory damages for pain and suffering under § 504), *rev'd on other grounds,* 474 U.S. 936, 106 S.Ct. 300, 88 L.Ed.2d 277 (1985). But what is important for our purpose is that punitive damages had never been awarded under § 504 and were widely believed to be unavailable under that section. See, *e.g., Cortes v. Board of Governors,* 766 F.Supp. 623, 626 (N.D.Ill.1991) ("There is insufficient reason to imply a punitive damage remedy when Congress has given no indication whatsoever that it intended to authorize such relief"); *Glanz v. Vernick,* 750 F.Supp. 39, 45 (D.Mass.1990) ("It is quite unlikely ... that Congress intended § 504 to provide a windfall to plaintiffs in the form of punitive damages"); *Martin v. Cardinal Glennon Memorial Hosp. for Children,* 599 F.Supp. 284 (E.D.Mo.1984) ("Punitive damages are clearly not available in an action under § 504"); *Gelman v. Department of Educ.,* 544 F.Supp. 651, 654 (D.Colo.1982) (compensatory, but not punitive, damages are available under § 504); Andrew J. Ruzicho, *et al., Employment Discrimination Litigation* 235 (1989) (employees may not collect "compensatory, liquidated, or punitive damages" under § 504); Charles R. Richey, *Manual on Employment Discrimination Law and Civil Rights Actions in the Federal Courts* 170 (1986) ("If damages are allowed [under § 504] they should be limited to compensatory, not punitive, damages"). In fact, it is not until 1994 that we find a single case where punitive damages were awarded under § 504. See *Kedra v. Nazareth Hosp.,* 868 F.Supp. 733 (E.D.Pa.1994).

Neither were punitive damages thought to be available under Title VI of the Civil Rights Act of 1964, the remedies of which had been made available under § 504. See, *e.g., Drayden v. Needville Independent Sch. Dist.,* 642 F.2d 129, 133 (5th Cir.1981) (no right even to compensatory damages); *Robinson v. English Dep't of the University of Pennsylvania,* 1988 WL 120738, at \*6 (E.D.Pa. Nov. 8, 1988) ("the prevailing view expressed in case law is that a private action under Title VI does not entitle a prevailing plaintiff to general or punitive damages");

*Singh v. Superintending School Comm. of the City of Portland,* 601 F.Supp. 865, 867 (D.Me.1985) (allowing general, but not punitive damages); *Concerned Tenants Ass'n of Indian Trails Apartments v. Indian Trails Apartments,* 496 F.Supp. 522 (N.D.Ill.1980) (no private cause of action for monetary damages); *Rendon v. Utah State Dep't of Employment Security Job Serv.,* 454 F.Supp. 534 (D.Utah 1978) (no private cause of action for general or punitive damages).

It is against this pre-*Franklin* background—virtual unanimity that § 504 did not allow any recovery of punitive damages—that we must examine the series of statutes amending the scope of the Rehabilitation Act.

In 1986 Congress passed the Civil Rights Equalization Act, 42 U.S.C. § 2000d–7(a), making the states subject to § 504—and to Title IX, Title VI, and the Age Discrimination Act—to the same extent as private parties. In the following year Congress passed the Civil Rights Restoration Act, strengthening the protections of § 504 and the other anti-discrimination provisions by overturning *Grove City College v. Bell,* 465 U.S. 555, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984). In neither of these pieces of legislation did Congress indicate any desire to change the established understanding that punitive damages were not available under § 504.

Four years after enacting the 1987 Civil Rights Restoration Act, Congress passed the Civil Rights Act of 1991. The 1991 Act was the result of an extensive legislative compromise between President Bush and Congress. Subject to a monetary cap that could not exceed $300,000, the new act made punitive damages available—for the first time—under § 501 of the Rehabilitation Act,[4] Title VII of the Civil Rights Act of 1964, and the Americans with Disabilities Act, 42 U.S.C. §§ 12101–12213. The 1991 Act did not extend the new punitive damages provision to § 504.

The plaintiff contends that because Congress did nothing to limit the availability of punitive damages, such damages must be presumed to have been available all along.

---

**4.** Section 501, 29 U.S.C. § 791, applies to discrimination by the government in its role as employer. Under § 505, Title VII remedies apply to § 501.

But generally speaking, at least, legislators are not clairvoyants. Punitive damages had never been awarded under § 504, and until 1992, at least, Congress had no reason to suppose that the courts were likely to start awarding punitive damages under that section. There was simply no reason for Congress to have considered limiting the availability of punitive damages in 1986, 1987, or 1991. The only inference of congressional intent that can be drawn from the three pieces of legislation is that Congress intended § 504 remedies to remain *in statu quo*—i.e., no punitive damages.[5]

It is true that in *Franklin* the Court indicated that passage of the 1986 and 1987 Acts evinced a congressional intent *not* to disturb the traditional presumption in favor of compensatory damages. But case law prior to passage of the Acts could reasonably be said to have put Congress on notice of this traditional presumption. See, *e.g., Guardians Ass'n v. Civil Service Comm'n of City of New York,* 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983) (where four justices would have allowed recovery of compensatory damages for violations of Title VI (*id.* at 615, 103 S.Ct. at 3239, dissenting opinion of Marshall, J.; *id.* at 639, 103 S.Ct. at 3252, dissenting opinion of Stevens, J., in which Brennan and Blackmun, JJ., joined) and two others left open the possibility of compensatory damages for intentional discrimination (*id.* at 597, 103 S.Ct. at 3229, opinion of White, J., announcing the judgment of the Court, in which Rehnquist, J., joined)); *Consolidated Rail Corp. v. Darrone,* 465 U.S. 624, 104 S.Ct. 1248, 79 L.Ed.2d 568 (1984) (backpay available for intentional discrimination); *Pfeiffer v. Marion Center Area Sch. Dist.,* 917 F.2d 779, 789 (3d Cir.1990) (compensatory damages available under Title IX for intentional discrimination); *Beehler v.*

*Jeffes,* 664 F.Supp. 931, 938–39 (M.D.Pa. 1986) (same). Congress had no similar notice that punitive damages might be awarded under § 504.

### B.

The repeated enactment of amendments to the Rehabilitation Act without altering the existing understanding that punitive damages were not available under § 504 is a pretty clear indication, we think, that Congress did not intend to allow such damages. But if we are wrong in this—if the amendments do not constitute the type of "clear direction" that is arguably necessary under *Franklin*—we are satisfied that punitive damages are not "appropriate" under § 504 in any event.

In the first place, punitive damages are plainly inappropriate under § 504 of the Rehabilitation Act in light of the monetary limits that Congress placed on punitive damages under § 501 of the same Act. It would be highly anomalous to let a plaintiff asserting an implied right of action under § 504 recover more in punitive damages than could be recovered by a plaintiff asserting the statutory remedy created for § 501.

In the second place, punitive damages are not appropriate because Congress has chosen other ways to "punish" those who violate § 504. Section 505, 29 U.S.C. § 794a, makes available under § 504 "[t]he remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964...." Title VI, 42 U.S.C. § 2000d–1, directs federal departments and agencies extending "Federal financial assistance" to promulgate rules under which funding will be terminated for those entities that discriminate on prohibited grounds. Administrative procedures have

---

5. We note also that at the time Congress passed the 1991 Civil Rights Act, the majority view among circuits was that a person who had been discriminated against in employment by the federal government could proceed under either § 504 or § 501. See *Gardner v. Morris,* 752 F.2d 1271, 1277–78 (8th Cir.1985); *Smith v. United States Postal Serv.,* 742 F.2d 257 (6th Cir.1984); *Treadwell v. Alexander,* 707 F.2d 473, 475 (11th Cir.1983); *Prewitt v. United States Postal Serv.,* 662 F.2d 292 (5th Cir. Unit A 1981). We must assume that Congress was aware of these deci-

sions. If Congress had believed punitive damages were allowed under § 504, it would have made little sense for Congress to cap punitive damages under § 501, but leave § 504 unaltered. A party against whom the federal government had discriminated in employment could have circumvented Congress' clear intent to limit punitive damages in such cases by pursuing his claim under § 504, rather than § 501. We doubt that Congress would have placed a limit on punitive damages that could so easily be avoided.

long since been created to terminate federal funding of recipients who fail to comply with § 504. See, *e.g.*, 49 C.F.R. § 27.125 (providing for the suspension of, or termination of, or refusal to grant or to continue "Federal financial assistance" to entities that fail to comply with § 504 under programs administered by the Secretary of Transportation).

A principle of statutory construction often applied by the Supreme Court teaches that "where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it." *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 19, 100 S.Ct. 242, 247, 62 L.Ed.2d 146 (1979), quoted in *Meghrig v. KFC Western, Inc.,* —— U.S. ——, ——, 116 S.Ct. 1251, 1256, 134 L.Ed.2d 121 (1996), and *Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n,* 453 U.S. 1, 14, 101 S.Ct. 2615, 2623, 69 L.Ed.2d 435 (1981), as well as in numerous other cases. The Court did, of course, read other remedies into Title IX in *Franklin.* But there the equitable remedies suggested by the defendant were clearly inadequate. *Franklin,* 503 U.S. at 76, 112 S.Ct. at 1038. In the case at bar, in contrast, the plaintiff will be fully compensated for his actual injuries.

In the third place, judicial creation of a punitive damages remedy would upset a long-standing balance that the courts, absent some contrary directive by Congress, should be vigilant to preserve. "Any interpretation of § 504," we are told, "must ... be responsive to two powerful but countervailing considerations—the need to give effect to the statutory objectives and the desire to keep § 504 within manageable bounds." *Alexander v. Choate,* 469 U.S. 287, 299, 105 S.Ct. 712, 719, 83 L.Ed.2d 661 (1985). The primary objective of § 504 is of course to prevent discrimination against the handicapped—something that "was perceived by Congress to be most often the product, not of invidious animus, but rather of thoughtless-

ness and indifference—of benign neglect." *Id.* at 295, 105 S.Ct. at 717. Punitive damages are hardly necessary to punish "thoughtlessness," and we have no reason to believe that the administrative scheme and the threat of compensatory damage awards are not adequate to accomplish the task of deterrence. Adding punitive damages to the mix, in our view, would expand § 504 beyond all "manageable bounds."

The whole issue of punitive damages is becoming an increasingly problematic one, of course, as a sort of game-show mentality leads some contemporary juries to award punitive damages in amounts that seem utterly capricious.[6] The Supreme Court has repeatedly struggled with the serious constitutional questions raised by such awards (see, *e.g.*, *BMW of North America, Inc. v. Gore,* —— U.S. ——, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996); *TXO Production Corp. v. Alliance Resources Corp.,* 509 U.S. 443, 454, 113 S.Ct. 2711, 2718, 125 L.Ed.2d 366 (1993); *Pacific Mut. Life Ins. Co. v. Haslip,* 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991)), and against this background we are even less enthusiastic than we might otherwise be about creating by implication a new punitive damages remedy (if a private fine may properly be called a "remedy") that Congress has never seen fit to create by statute. It would be particularly unseemly for the judicial branch to create a mechanism allowing a § 504 plaintiff such as Mr. Moreno to receive a punitive damage windfall measured in the millions of dollars, when a plaintiff suing under § 501 could not receive punitive damages of more than $300,000 under the mechanism created by the branches of government to which our Constitution has entrusted the enactment of legislation.

The judgment of the district court is **AFFIRMED** as to both of the issues raised on appeal.

---

**6.** The dissenting opinion suggests that capricious punitive damage verdicts would never be a problem if judges never allowed any recovery of punitive damages except upon proof of truly egregious misconduct by the defendant. But notions of what is 'egregious' can sometimes be rather expansive, as is demonstrated by the original panel's decision to allow recovery of punitive damages in the case at bar. See 63 F.3d at 1419 (vacated). One wonders, moreover, how effective the judiciary would really be in policing the size of punitive damage awards which, not having been authorized by statute, would be subject to no statutory cap.

RYAN, Circuit Judge, concurring separately.

In August 1995, as a member of the panel that decided this case initially, I subscribed to the view that punitive damages are available under section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. I reached that conclusion because I thought the Supreme Court implicitly authorized punitive damages in Section 504 actions by reason of some of the language it employed in *Franklin v. Gwinnett County Public Schools,* 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992), particularly the statement that "federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute." *Id.* at 71, 112 S.Ct. at 1035. Indeed, that was the view of all three members of the panel.

On rehearing *en banc,* I have revisited that question, and, after much deliberation and study, I am now satisfied that I erred in my initial judgment. I now think I assigned too little significance to the expression "appropriate relief" in the foregoing quotation, particularly in light of other language on the subject of damages in *Franklin,* and in view of the compelling points made in part IV.B. of Judge Nelson's excellent opinion for the *en banc* court.

While I am unpersuaded by the portion of my brother's opinion which posits that Congress has indicated its intention not to allow punitive damages in section 504 actions, I recognize that the point is one subject to reasonable dispute, and I confess that my brother has made a compelling if, to me, unpersuasive case for the congressional intent argument.

In sum, then, I concur in the majority view that Consolidated Rail Corporation has subjected itself to the prohibitions of section 504 by accepting federal funds for its railroad crossing improvements. I also now agree that punitive damages are not available under section 504, because, for the reasons developed in part IV.B. of Judge Nelson's opinion, punishment is not "appropriate relief" within the context of that statute.

BOYCE F. MARTIN, Jr., Chief Judge, concurring in part and dissenting in part.

I join Judge Daughtrey's opinion concurring in part and dissenting in part. I agree that the Consolidated Rail Corporation has received federal assistance, and I agree with Judge Daughtrey that punitive damages are appropriate in Section 504 cases.

DAUGHTREY, Circuit Judge, concurring in part and dissenting in part.

As noted in the majority opinion, Section 504 of the Rehabilitation Act of 1973 states that

> [n]o otherwise qualified individual with a disability in the United States, ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance....

29 U.S.C. § 794(1996). The Act then provides that "[t]he remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964," 42 U.S.C. § 2000d *et seq.,* are available for violations of § 504. 29 U.S.C. § 794a. Although § 504, like Title VI, is silent as to the availability of private causes of action, this court, like many others, has concluded that § 504 creates an implied private right of action. *Jennings v. Alexander,* 715 F.2d 1036, 1040–41 (6th Cir.1983), *rev'd on other grounds, Alexander v. Choate,* 469 U.S. 287, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985).

I agree with the majority that Consolidated Rail is "receiv[ing] Federal financial assistance" within the meaning of § 504 and, hence, is governed by that statute. I must, however, disagree with the majority's conclusion that punitive damages are unavailable for a violation of § 504. The United States Supreme Court clearly framed the issue for us in *Franklin v. Gwinnett County Pub. Schs.,* 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992), in which the issue was whether monetary damages were available in an implied private right of action under Title IX of the Educational Amendments of 1972, 20 U.S.C. §§ 1681–88, which prohibits dis-

crimination in educational programs receiving federal funds. The Court held that

> [t]he general rule ... is that absent clear direction to the contrary by Congress, the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute.

*Id.* at 70–71, 112 S.Ct. at 1035. This clear directive must guide our thinking in determining the availability of punitive damages in actions under § 504 of the Rehabilitation Act.

Applying *Franklin* to the case at hand, two questions follow. First, we must ask whether Congress intended to limit the application of this general principle in § 504 cases. Because a private cause of action has been implied in § 504, we cannot expect to unearth legislative history about the availability of remedies. However, as the Court in *Franklin* did, we can "evaluate the state of the law" surrounding the passage of § 504 in order to determine whether Congress intended to limit the general rule in favor of all appropriate forms of relief. *Franklin*, 503 U.S. at 71, 112 S.Ct. at 1035–36; *CSX Transp., Inc. v. Marquar*, 980 F.2d 359, 364 (6th Cir.1992). After evaluating the state of the law to ensure that Congress did not limit § 504 remedies, we must ask whether the disputed remedy is "appropriate." *Marquar*, 980 F.2d at 367.

When we examine the state of the law surrounding § 504's passage, *Franklin* provides even more insight into this case. Although *Franklin* was concerned with the appropriate remedies available under Title IX, the analysis it uses applies *directly* to § 504 cases. The Court observed that before and after passage of Title IX, it applied the general rule treating "the denial of a remedy as the exception rather than the rule." *Franklin*, 503 U.S. at 71, 112 S.Ct. at 1036. The Court then noted that in the interim since it had found an implied private right of action in Title IX cases, Congress had twice broadened the coverage of Title IX, Title VI, § 504 of the Rehabilitation Act, and the Age Discrimination Act. Yet in these modifications—the Rehabilitation Act Amendments of 1986, 42 U.S.C. § 2000d–7, and the Civil Rights Restoration Act of 1987, Pub.Lamb.

100–259, 102 Stat. 28—Congress did not alter the presumption that any appropriate remedy was available under the statutes. *Franklin*, 503 U.S. at 72–73, 112 S.Ct. at 1036–37. Given Congress's modifications of the Rehabilitation Act and failure to alter the presumption that any appropriate remedy is available, one can only conclude that Congress has not intended to narrow the available remedies in § 504 cases.

The second question is whether punitive damages are "appropriate" in § 504 cases. *Marquar*, 980 F.2d at 367. Punitive damages serve to deter certain conduct, as well as to punish. *Smith v. Wade*, 461 U.S. 30, 49, 54–55, 103 S.Ct. 1625, 1639–40, 75 L.Ed.2d 632 (1983). Because § 504 is designed to eliminate discrimination against qualified handicapped persons, deterrence is an appropriate remedial goal. In such circumstances, punitive damages are completely warranted. Various civil rights statutes reflect this thinking by permitting punitive damages explicitly—for example, Title VII of the Civil Rights Act of 1964; § 501 of the Rehabilitation Act of 1973; and Title I of the Americans with Disabilities Act. *See* 42 U.S.C. § 1981a (all permitting recovery of punitive damages). Moreover, the Fourth Circuit has observed that Rehabilitation Act cases are similar to tort claims, *see Pandazides v. Virginia Bd. of Ed.*, 13 F.3d 823, 829 (4th Cir.1994); punitive damages undeniably have a significant place in tort law. *Silkwood v. Kerr–McGee Corp.*, 464 U.S. 238, 255, 104 S.Ct. 615, 625, 78 L.Ed.2d 443 (1984).

The majority's footnote that "it is by no means clear that *Franklin* has more than peripheral relevance to the case at bar" rests on the observation that *Franklin* spoke in compensatory terms such as "mak[ing] good the wrong done" and "redress[ing] injuries." *Franklin*, 503 U.S. at 66, 112 S.Ct. at 1033. But this analysis ignores the Supreme Court's directive in *Franklin* to permit "any appropriate relief."

The majority also relies extensively on pre-*Franklin* case law, which was divided on the propriety of all types of damages in § 504 cases. *Compare Eastman v. Virginia Polytechnic Inst. & State Univ.*, 939 F.2d 204, 209

(4th Cir.1991)(§ 504 does not permit compensatory damages for pain and suffering or punitive damages), *with Kling v. County of Los Angeles*, 769 F.2d 532, 534 (9th Cir.)(allowing damages in § 504 cases), *rev'd on other grounds*, 474 U.S. 936, 106 S.Ct. 300, 88 L.Ed.2d 277 (1985). Many pre-*Franklin* decisions found punitive damages inappropriate under § 504, as the majority points out. *Cortes v. Bd. of Governors*, 766 F.Supp. 623, 626 (N.D.Ill.1991); *Glanz v. Vernick*, 750 F.Supp. 39, 45 (D.Mass.1990); *Martin v. Cardinal Glennon Memorial Hosp. for Children*, 599 F.Supp. 284 (E.D.Mo.1984); *Gelman v. Dep't of Educ.*, 544 F.Supp. 651, 654 (D.Colo.1982). While the majority's reliance on these cases would have been reasonable before 1992, its reliance on pre-*Franklin* cases ignores our responsibility since *Franklin* to permit "any appropriate relief" in the absence of "clear direction to the contrary by Congress." The musings of these pre-*Franklin* courts are therefore irrelevant to our present dilemma. The majority insists that in light of this case law, Congress had no reason to assume that courts would award punitive damages under § 504 and, therefore, no reason explicitly to have limited the availability of punitive damages. However, this inferential reasoning ignores the beauty of the *Franklin* decision, which does not ask what Congress "assumed" or "understood" when it failed to act. Rather, *Franklin* directs us to permit "any appropriate relief" unless Congress has issued a "clear direction" otherwise. In my judgment, *Franklin* requires us to forego the delving into legislative intent in which the majority is engaged.

Finally, I cannot help but observe that the majority's conclusion that punitive damages are inappropriate under § 504 appears to have more to do with its fear of a "game-show mentality" leading to "capricious" awards than with the nature of the Rehabilitation Act. Noting that discrimination "was perceived by Congress to be most often the product, not of invidious animus, but rather of thoughtlessness and indifference—of benign neglect," *see Alexander v. Choate*, 469 U.S. 287, 295, 105 S.Ct. 712, 717, 83 L.Ed.2d 661 (1985), the majority concludes that punitive damages are unnecessary "to punish 'thoughtlessness'." However, as the majority must be aware, punitive damages are not awarded unless a plaintiff can prove more than thoughtlessness or indifference. In civil rights cases in this circuit, we require proof of "egregious conduct or a showing of willfulness or malice on the part of the defendant." *Beauford v. Sisters of Mercy—Province of Detroit, Inc.*, 816 F.2d 1104, 1109 (6th Cir.), *cert. denied*, 484 U.S. 913, 108 S.Ct. 259, 98 L.Ed.2d 217 (1987). The majority's concern about punitive damages being awarded for simple thoughtlessness ignores the existence of the behavior that punitive damages are meant to deter, and it gives the misleading impression that mere indifference can support a punitive damages award.

For these reasons, I respectfully must dissent from Part IV of the majority's opinion.