242 F.3d 58 (2nd Cir. 2001)
 DEREK I. TOLBERT, Plaintiff-Appellant,
v.
QUEENS COLLEGE, THE CITY UNIVERSITY OF NEW YORK, STUART LIEBMAN, Professor, and HELEN SMITH CAIRNS, Professor, Defendants-Appellees,
ERIC GANDER, Professor, Defendant.
 Docket No. 00-7143
August Term, 2000
 UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
 Argued: October 4, 2000
Decided: February 22, 2001
 
 Appeal from a judgment of the United States District Court for the Eastern District of New York, Bernard A. Friedman, Judge, setting aside jury verdict that awarded plaintiff $50,000 in punitive damages on claims of race discrimination in violation of 42 U.S.C. §§ 1981 and 2000d et seq., and granting appellees judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b).
 Reversed and remanded.[Copyrighted Material Omitted][Copyrighted Material Omitted]
 SCOTT A. KORENBAUM, Hempstead, New York (Frederick K. Brewington, Hempstead, New York, on the brief), for Plaintiff-Appellant.
 CLEMENT J. COLUCCI, Assistant Attorney General, New York, New York (Eliot Spitzer, Attorney General of the State of New York, Robert A. Forte, Deputy Solicitor General, Michael S. Belohlavek, Assistant Solicitor General, New York, New York, on the brief), for Defendants-Appellees.
 Before: KEARSE, CALABRESI, and SOTOMAYOR, Circuit Judges.
 KEARSE, Circuit Judge:
 
 
 1
 Plaintiff Derek I. Tolbert appeals from a final judgment of the United States District Court for the Eastern District of New York, Bernard A. Friedman, Judge*, dismissing as a matter of law his claim that defendants Queens College of the City University of New York ("Queens College" or the "College"), Stuart Liebman, and Helen Smith Cairns (collectively "defendants") discriminated against him on the basis of race. Following a jury verdict finding that Tolbert was the victim of racial discrimination by the College in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. §2000d et seq. (1994) ("Title VI"), and by Liebman and Cairns in violation of 42 U.S.C. §1981 (1994), and awarding Tolbert $50,000 in punitive damages, the district court entered judgment in favor of defendants pursuant to Fed. R. Civ. P. 50(b) on the ground that the evidence presented at trial was insufficient to permit a rational juror to find that any of the defendants discriminated against Tolbert on the basis of race. On appeal, Tolbert contends that the district court erred by failing to view the evidence in the light most favorable to him. For the reasons that follow, we reverse and remand for entry of an amended judgment reinstating the jury's award of punitive damages and awarding Tolbert nominal damages.
 
 I. BACKGROUND
 
 2
 Tolbert is an African-American who was an English teacher in the New York City school system. In 1989, in order to maintain his teaching eligibility and to qualify for a higher-salaried position, Tolbert enrolled in the Media Studies program offered by the Queens College Department of Communication Arts and Sciences (the "Department"), seeking a Master's degree in communications. Liebman and Cairns were professors in the Department; Cairns was its chair. The evidence at trial, taken in the light most favorable to Tolbert as the party against whom judgment was entered as a matter of law, is summarized as follows.
 
 
 3
 A. Tolbert's Experience Prior to the Comprehensive Examination
 
 
 4
 In or about 1990, Tolbert temporarily withdrew from the Media Studies program for personal reasons; the hiatus lasted approximately two years, and he received grades of "Incomplete" in three courses. On his return to the program in 1992, he sought to complete the requirements for his degree. In that endeavor, he worked with Professor Jonathan Buchsbaum, coordinator of the Media Studies program, whom Tolbert had not previously met.
 
 
 5
 Tolbert testified that his efforts to obtain his Master's degree were frustrated because "[t]hey just kept changing standards or kept changing what was asked of me." (Trial Transcript ("Tr.") 20.) As an example, he testified that he had completed an internship and believed his obligations with respect to that requirement had been fulfilled. But after the internship's completion, he was informed for the first time by Buchsbaum that he must also write a paper. (Tr. 19-20.) Tolbert inquired as to the nature of the paper that was required; Buchsbaum told him to write about what he had done in the internship, his daily activity, what he had learned, what his duties had been. But when Tolbert wrote such a paper, Buchsbaum said that that was not what he wanted. Tolbert complained about these "flip-flops" (Tr. 19) to Queens College Dean Mary Jane Wochinger.
 
 
 6
 Tolbert also testified that his understanding had been that in two of the courses in which he received grades of Incomplete--those taught by Professors Ibok and Mohammadi, who had since left Queens College--his papers would be sent to the departed professors for grading. He submitted two papers and was subsequently informed that Ibok had given the paper for her course a B. However, when he thereafter inquired of the College registrar, he was informed that his grade had not been changed to B but remained an Incomplete. When he inquired of Buchsbaum, Tolbert was informed that the grade "was not to [Buchsbaum's] liking" and that Buchsbaum said "he had taken over the matter" (Tr.19); "that Professor Ibok had graded the paper[ and] sent in the grade, [but that Buchsbaum] was going to change it" (id.); and that Buchsbaum told him "you are going to have an F" (Tr. 26). Buchsbaum charged that the papers Tolbert submitted for the Ibok and Mohammadi courses were unacceptable because they were papers that Tolbert had submitted in other courses (the "allegedly recycled papers"). Tolbert denied the accusation but submitted new papers.
 
 
 7
 Tolbert testified that Buchsbaum, in discussing his rejection of one of the allegedly recycled papers, "was gleeful in what he was saying." (Tr. 26.) Tolbert did not react well to Buchsbaum's attitude; their conversation became strident, and Tolbert stormed out of the office. Tolbert indicated that he again complained to Dean Wochinger about Buchsbaum. At some point, he received a short letter from Buchsbaum stating that Buchsbaum would have Tolbert's grade in the Ibok course changed from Incomplete to B. Tolbert also received a lengthier letter upbraiding him for profane, rude, and threatening behavior at his prior meeting with Buchsbaum and stating that repetition of such behavior would not be tolerated. Tolbert conceded that in that conversation he had used profanity by stating that he was getting the "hell" out of there; but he denied that he had become rude or threatening to Buchsbaum, because he was trying to get his degree. (Tr. 26-29.)
 
 
 8
 After successfully resubmitting papers for the Ibok and Mohammadi courses, Tolbert researched and prepared what was to be his final paper, to be graded by Buchsbaum. Tolbert testified that he commented, in discussing his topic with Buchsbaum, that in the 1930s or 1940s black persons did not own radio stations but rented air time, and those who entered the station were required to use the back stairs. According to Tolbert, Buchsbaum responded in essence that "[i]t always seems the blacks have to go up the back stairs or are second rate" (Tr. 33); and Buchsbaum's manner and demeanor suggested to Tolbert that he agreed that blacks were second-rate.
 
 
 9
 When Tolbert eventually submitted his paper, Buchsbaum accused him of plagiarizing most of it. Though Tolbert denied the accusation, contending that he had made adequate attribution of the contents to their source, Buchsbaum found the plagiarism "astonish[ing]" (Tr. 367), and gave the paper to Liebman. Liebman reviewed it and testified at trial that the paper was "plagiarized in the most obvious amazing astounding way [he] had ever seen in all [his 20-odd] years as an instructor" (Tr. 297). Buchsbaum had previously brought Tolbert's allegedly recycled papers to the attention of other members of the Department at meetings attended by Liebman and Cairns. A third meeting was held to discuss the accusation of plagiarism. Notwithstanding the seriousness of the charge, which Liebman termed "cheating" (Tr. 298), the Department decided simply to fail Tolbert on that paper, allow him to submit another, and give him a C in the course.
 
 B. The Comprehensive Examination
 
 10
 In order to receive a Master's degree from the Department at the time of these incidents, candidates were required, in addition to their course work, to pass a comprehensive examination. The examination consisted of a number of pass/fail essay questions from which the candidate was to select four to answer; passing grades were needed on all four. Each essay was graded initially by two professors; if the grades from those two professors differed, the essay was graded by a third professor to break the deadlock.
 
 
 11
 Tolbert sat for his comprehensive exam in June 1993; on all four of the essays he wrote, he ultimately received failing grades. On three of those essays, one of the initial graders was Professor Eric Gander. Gander, who had never had any contact with Tolbert nor even heard his name, gave each essay a passing grade. On two of those three essays, Liebman was the other initial grader; Liebman gave Tolbert a failing grade on each; Buchsbaum was the tie-breaker, also giving Tolbert a failing grade. On the third essay that was awarded a passing grade by Gander, the other initial grader was Buchsbaum; Buchsbaum gave Tolbert a failing grade, and Liebman was the tie-breaker who gave Tolbert a failing grade. The fourth essay was graded by Buchsbaum and Professor Colleen Roach, each of whom gave Tolbert a failing grade.
 
 
 12
 Five other students--some of them Chinese, none of them African-American--took the examination at the same time as Tolbert, with varying degrees of success. None of the others received failing grades on more than one essay.
 
 
 13
 According to Department procedure, the exams were to be blind-graded. The essays were written in blue books; code letters were placed on both the cover and the contents. The student's name appeared only on the cover, and photocopies of only the interior were distributed to professors for grading. Despite this system, there was evidence that the contents or style of a given essay may have made the author identifiable. For example, Tolbert, in one of his essays, made reference to one of the papers he had given Buchsbaum for the Ibok course. Buchsbaum acknowledged at trial that he could have known from the reference that the writer was Tolbert; he also testified that he could probably recognize handwriting he had seen before.
 
 C. The Explanations for Tolbert's Grades
 
 14
 After learning that he had received failing grades on all four essays, Tolbert made numerous attempts to learn why. He repeatedly telephoned Cairns and wrote her notes asking her to get in touch with him. Though Cairns testified that she had returned all of Tolbert's calls, Tolbert testified that he did not remember receiving any response from her until he again complained to Dean Wochinger. After that complaint (Cairns testified that Tolbert also had complained about the department to Dean Ericson), Tolbert received a letter from Cairns that stated as follows:
 
 
 15
 I understand that you have requested information regarding your unsatisfactory performance on the comprehensive examination recently administered in our Masters Program in Media Studies.... I will arrange for several members of our graduate faculty to meet with you and me to discuss your comprehensive examination.
 
 
 16
 It has also come to my attention that you have been calling our department office frequently. I must request that you stop doing this. If you need to communicate with me or any member of the department you should do so in writing. I believe Professor Buchsbaum has made this request of you previously. I am going to ask members of the departmental staff not to communicate by phone with you in the future. I must tell you that further calls to the office will jeopardize your already tenuous relationship with the Department of Communication Arts and Sciences.
 
 
 17
 (Letter from Cairns to Tolbert dated August 4, 1993.)
 
 
 18
 The meeting was held on October 6, 1993 ("October 6 Meeting"), and was attended by Liebman, Cairns, Gander, Tolbert, and Tolbert's public school teaching colleague Binnie Meltzer. An adjunct professor was brought in to take notes. Tolbert began by asking the reason for the failing grades he had received. Liebman initially responded that much of the content of the essays was erroneous or not well documented. Tolbert, however, disputed that assessment and testified that he pointed out specific passages in his essays and the sources he had cited in them. He testified that after he refuted the criticisms of the essays' contents, the Department members "more or less conceded that the factual content was indeed okay and backed up off that position and went to that my writing was substandard.... [T]hey switched horses in the middle of the stream." (Tr. 57.)
 
 
 19
 Tolbert testified that when the criticism was redirected to his writing, he asked, "Are you telling me that some of the non-native American speaking students, particularly Chinese students in the room answered their questions and answered better than I did. I asked out of pure curiosity." (Tr. 58.) Liebman's response was "that the Chinese students were allowed for [sic] certain inconsistencies in their writing because they weren't born here more or less and that they were cut slack quote... on their exams." (Id.)
 
 
 20
 Meltzer's account of the October 6 Meeting was similar. She testified that Liebman said"we give extra slack to Chinese students." (Tr. 261.) Meltzer testified that upon hearing this statement she looked inquiringly at Cairns and that Cairns "[d]efinitely" indicated her agreement by nodding. (Tr. 262.)
 
 
 21
 No one asked at the meeting what Liebman meant when he said "we cut slack." Tolbert testified that he was too stunned. Meltzer testified that she understood that phrase to have its ordinary meaning, i.e., that Chinese students were graded under an easier standard.
 
 
 22
 Cairns initially testified at trial that she believed she understood what Liebman meant by "we cut slack," and testified in part as follows:
 
 
 23
 Q. ... [D]o you recall a reference by Professor Liebman in that meeting to cutting certain students slack?
 
 
 24
 A. Yes.
 
 
 25
 ....
 
 
 26
 Q. Wouldn't you say that his statement concerning cutting particularly Chinese students a little slack was entirely appropriate?
 
 
 27
 A. Yes.
 
 
 28
 (Tr. 184 (emphases added).) Cairns later testified, however, that she did "not remember specific reference to Chinese students" (Tr. 187) and that she had heard nothing at the October 6 Meeting that suggested to her that Chinese students or any ESL students "were being graded any differently from anybody else" (Tr. 231-32). She testified that Liebman had been saying that allowances were made not for certain groups of students but for certain types of errors: "The point of the comment was that what is important in an essay is not these microaspects of grammar and punctuation and spelling and so on but what we don't excuse is errors in organization and structure and citations." (Tr. 215.) She testified that "grammar, sentence structure and the like" are "considered not important across the board" (Tr. 225), that their lack of importance was "the same for ESL or non-ESL students" (Tr. 226), and that Liebman had been using ESL students merely "as an example" (Tr. 231).
 
 
 29
 Liebman acknowledged at trial that he had used the phrase "we cut slack" in response to Tolbert's query as to how he could have failed when he knew he wrote better than the Chinese students. (Tr. 306.) Liebman stated that he had responded that writing is not the issue, something to that effect. By that, I meant grammar syntax, that is not the point of this exam. We cut slack for that.
 
 
 30
 Now it was in the context of Chinese and ESL students but that's what he had introduced, he had brought that up. So I tried to say look, we cut slack on that, not implying, not ever intending to mean that we cut more slack, the word I heard today, more slack. I never said that. We cut slack for Chinese and ESL students. The point was that grammar, syntax and so on were not a criteria [sic] for any student in this exam, in other words, I was saying don't worry about that, worry about content, vagueness and et cetera, et cetera, et cetera, that was basically it.
 
 
 31
 (Tr. 307.)
 
 
 32
 Liebman also acknowledged that in his deposition, 2½ years prior to trial, he was asked what he had meant at the October 6 Meeting by "we cut slack," and he had responded that he was not sure what he had actually said or what the context was. He testified that he "was less certain then" than he was at trial (Tr. 329) as to what he had meant by his "cut slack" statement.
 
 
 33
 Meltzer testified that during and after the October 6 Meeting she unsuccessfully inquired as to the Department's grading standards. At the meeting, she asked to see the grading "criteria," "the weight of the questions," and "the standard by which [Tolbert's] exam was graded"; Cairns's response was, "we don't have those things." (Tr. 259.) Immediately after the meeting, Meltzer asked Cairns how the examinations could be graded without some set of objective criteria. (Tr. 262.) Meltzer testified that Cairns "said we can mark as we set [sic] fit. We don't need to have objective criteria." (Tr. 263.)
 
 
 34
 After the October 6 Meeting, Tolbert showed his examination essays to a professor in the College's English Department and asked whether they were sufficiently well written to warrant a passing grade "as graduate writing" (Tr. 60). He was reassured by the response.
 
 
 35
 Tolbert was offered the opportunity to sit for the Media Studies comprehensive examination a second time; he declined. He instead pursued and received in 1996 a Master's degree from the College in secondary education in English. Pursuit of the degree in the English Department cost him additional tuition and delayed by three years the salary increases he received as a public school teacher for his completion of an advanced degree.
 
 D. The Present Lawsuit
 
 36
 Based largely on Liebman's statement at the October 6 Meeting that the Department "cut slack" for Chinese students, Tolbert commenced the present action in 1994 against the College, Liebman, Cairns, and Gander, asserting that they violated, inter alia, Title VI and §1981 in denying him the Master's degree in Media Studies by applying standards based in whole or in part on students' race and/or ethnic origin. Defendants moved to dismiss on various grounds, including Eleventh Amendment immunity, failure to state a claim, and qualified immunity.
 
 
 37
 The district court, Reena Raggi, Judge, granted certain motions and denied others. On Eleventh Amendment grounds, the court dismissed the claims for money damages against the College and against the individual defendants in their official capacities insofar as those claims were asserted under 42 U.S.C. §1983 for violation of §1981, see, e.g., Will v. Michigan Department of State Police, 491 U.S. 58, 64, 71 (1989) (neither a state agency nor a state official sued in his or her official capacity is a "person" within the meaning of §1983). The court also granted a motion to dismiss all claims against Gander, given that he had awarded Tolbert only passing grades. It denied a motion by Liebman and Cairns for summary judgment on the ground of qualified immunity; the court noted that the premise of that defense was defendants' contention that there had been no discrimination, and it ruled that the record revealed triable questions of fact on that issue. Although Liebman and Cairns immediately sought review of that ruling, their appeal was dismissed for lack of appellate jurisdiction. See Tolbert v. Queens College, 164 F.3d 132 (2d Cir. 1999) (denial of qualified-immunity-based motion for summary judgment because of existence of genuinely disputed issues of material fact is not immediately appealable).
 
 
 38
 Following the dismissal of that appeal, a four-day jury trial, presided over by Judge Friedman, sitting by designation, was held on the Title VI claim against the College and the §1981 claims against Liebman and Cairns. The trial witnesses were Tolbert, Meltzer, Liebman, Cairns, and Buchsbaum.
 
 
 39
 At the close of Tolbert's case, defendants moved pursuant to Fed. R. Civ. P. 50(a) for judgment as a matter of law. As discussed in Part II.C.2. below, they argued that Tolbert had failed to prove that defendants took any action against him "because he was African-American" (Tr. 273), and that if anything, Tolbert had proven either "discrimination on the basis of language[,] which isn't covered by Title VI[,] 1983[,] and 1981" (Tr. 274), or "that they just didn't like Derek Tolbert and were out to get him because of personal animus against him because they didn't like the way he acted" (Tr. 273). Defendants argued that Tolbert's claims were based entirely on "a very ambiguous remark" at the October 6 Meeting (Tr. 274), and that even "if there was any [racial/ethnic] discrimination floating in the air, there was no way to execute it" because the examinations were anonymous (Tr. 275). The court reserved decision. Defendants again moved for judgment pursuant to Rule 50(a) at the close of all the evidence, without further elaboration. The court again reserved decision.
 
 
 40
 The district court instructed the jury, inter alia, that Tolbert was required to prove by a preponderance of the evidence that defendants actually were motivated by a racially discriminatory purpose. It is not enough for plaintiff to show, for example, that defendant's conduct has a negative impact on members of plaintiff's race or that a policy of the defendants, neutral on its face, had a disproportionate negative effect on members of his race. When taken together with other evidence, such evidence may prove that the defendants were motivated by a racially discriminatory purpose.
 
 
 41
 (Tr. 462.) The court cautioned that "the mere existence of such disparities does not automatically demonstrate a discriminatory intent" (id.), and that Tolbert was required to "prove more than the occurrence of isolated or accidental acts; he must establish by a preponderance of the evidence that the defendants intentionally discriminated against him on the basis of race" (Tr. 463). The court stated that [i]f the plaintiff was subjected to intentional discrimination solely because of his ancestry or ethnic characteristics, then you should find that the alleged discrimination was based on race. If, however, you believe that the alleged discrimination was not based on race alone, but rather on gender, religion, country of birth, or any other basis, then you must find for the defendants.
 
 
 42
 (Tr. 461.)
 
 
 43
 The court instructed that "[e]ach defendant is entitled to fair, separate and individual consideration of the case with regard to your decision as to the other defendants," but that [i]f two or more persons unite in an intentional act that violates another person's rights, then all of those persons are jointly liable for the acts of each of them....
 
 
 44
 (Tr. 466.) The court instructed the jury that Tolbert was entitled to rely on both direct and circumstantial evidence to show racial discrimination, and that in determining how to assess the credibility of each witness and what inferences to draw from his or her testimony, the jury was entitled to consider that witness's interest, affinities, and biases, to use its own common sense, and to consider the evidence as a whole.
 
 
 45
 As discussed in Parts II.B., C., and D. below, the court instructed that if the jury found a defendant had intentionally discriminated against Tolbert on the basis of race or ethnicity, it should address the questions of damages. The court advised the jury that it must award compensatory damages for any injury proximately caused by that defendant's conduct; that it could award nominal damages if it found no compensatory damages; and that it had discretion to award punitive damages against any defendant whose conduct it found was "not merely unreasonable" but was "wanton and reckless" i.e., "done in such a manner and under such circumstances as to reflect utter disregard for the potential consequences of the act on the safety and rights of others." (Tr. 468-69.)
 
 
 46
 The awarding of punitive damages is within your discretion. You are not required to award them. Punitive damages are appropriate only for especially shocking and offensive misconduct. If you decide to award punitive damages, you must use sound reason in setting the amount, it must not reflect bias, prejudice, or sympathy toward any party....
 
 
 47
 (Tr. 469.) There were no pertinent objections to the jury charge.
 
 
 48
 The jury was given a verdict form setting out discrete questions with respect to the liability of Liebman, Cairns, and the College, and with respect to compensatory, nominal, and punitive damages. The jury returned a verdict finding that Tolbert had proven by a preponderance of the evidence that he was the victim of discrimination on the basis of his race by Liebman, Cairns, and the College. It awarded no nominal or compensatory damages; but it awarded $50,000 in punitive damages against all three defendants.
 
 
 49
 Defendants, pursuant to Fed. R. Civ. P. 50(b), renewed their motion for judgment as a matter of law. The district court granted the motion in an Opinion and Order Granting Defendants' Motion for Judgment as a Matter of Law and Denying Plaintiff's Motion for Sanctions, dated January 7, 2000 ("Opinion"). The district court noted preliminarily that
 
 
 50
 [t]he failure of the jury to award even nominal damages, despite having found all three defendants liable, is attributable to an erroneous jury instruction.... [T]he jury was charged as follows: "Even if you find that the plaintiff has failed to provide any proof of the extent of the damages he suffered because of defendants' conduct, you still may award damages in some nominal amount, such as one dollar." While no party objected to this instruction, it was nonetheless an incorrect, or at least an incomplete, statement of the law.... Instead, the jury should be instructed that "plaintiff is entitled to an award of at least nominal damages as a matter of law," if such a violation has been established. [Robinson v. Cattaraugus County, 147 F.3d 153, 162 (2d Cir. 1998)]. Under Robinson, the jury should have been instructed that it must, not may, award at least nominal damages if it found that defendants violated plaintiff's rights.
 
 
 51
 Opinion at 3-4. The court noted that the failure to give the correct charge on nominal damages could be cured by the court's entry of judgment awarding such damages; but it stated that in the present case the error was "moot due to the complete lack of evidence to support the jury's finding as to liability." Id. at4.
 
 
 52
 Turning to the merits, the court quoted Tolbert's testimony as to the "statement made by Professor Liebman to the effect that the department 'cuts slack' for students who do not speak English as their native language," id. at 8, and stated that Tolbert's
 
 
 53
 entire case against Professor Liebman is based on this single comment, and the fact that Professor Liebman was one of the readers who gave a failing grade to three of plaintiff's essay answers. Plaintiff's entire case against Professor Cairns is that she, as the chair of the department, failed to intervene when Professor Liebman made this comment.
 
 Id. at 9. The court found that
 
 54
 [o]n this record, there is simply no evidence from which a reasonabl[e] jury could have found that Professor Liebman's comment regarding cutting slack for Asian or Chinese or ESL students meant that Professor Liebman, or the media studies department generally, had a racially discriminatory grading policy. Professor Liebman's comment was ambiguous and it is not, on its face, indicative of any such discrimination. Moreover, the only evidence explaining the comment indicates that students who do not speak English as their native language were "cut slack" only in the sense that grammatical, punctuation and spelling errors were overlooked.... There is absolutely no evidence whatsoever to support a finding that these students were "cut slack" on matters of substance. In fact, the only evidence on this particular point was to the effect that the substance of every student's examination was graded in the same manner, and that a student's race or ethnicity played no role whatsoever in the evaluation.... In short[,] there is a complete lack of evidence to support plaintiff's contention that Professor Liebman's comment demonstrates the existence of a racially discriminatory grading policy. All of the evidence is to the contrary.
 
 
 55
 On this record--again, viewing the evidence in the light most favorable to plaintiff and drawing all reasonable inferences in his favor--there is no conceivable way a reasonable jury could have found that Professor Liebman discriminated against plaintiff based on his race in giving his examination a failing grade. Nor, for the same reason, could a reasonable jury have found that Professor Cairns discriminated against plaintiff by failing to intervene when Professor Liebman made his "cut slack" comment or by failing to take any other action against the allegedly discriminatory grading policy. Since plaintiff failed to prove the existence of any such policy, and since defendants[] conclusively disproved its existence, there is no basis to plaintiff's argument that Professor Cairns had [a] duty to intervene. A fortiori, there is no basis at all for the jury's award of punitive damages against either Professor Liebman or Professor Cairns, as there was no evidence that they discriminated against plaintiff to even the slightest degree, to say nothing of the "malice," "evil motive" or "reckless indifference" which must be proven in order to support an award of punitive damages.... Accordingly, the court shall set aside the jury's verdict as to Professors Liebman and Cairns and enter judgment in their favor. The verdict against the college must likewise be set aside insofar as it is based on the "cut slack" comment by Professor Liebman.
 
 
 56
 Id. at 11-12. The court noted that "[t]here was some testimony which cast doubt on whether [the grading] system was, in fact, truly anonymous in this instance." Id. at 7 n.4. It found, however, that, even assuming the grading process was not in fact anonymous and the examination was not graded in accordance with any set of objective criteria, those facts "do not support plaintiff's case." Id. at 13.
 
 
 57
 This appeal followed.
 
 II. DISCUSSION
 
 58
 On appeal, Tolbert challenges the granting of judgment as a matter of law, arguing that he presented sufficient evidence to permit a rational juror to find in his favor. He asks that the punitive damages award be reinstated and that he be awarded $1 in nominal damages. Defendants, in opposition, urge that the judgment be upheld on the grounds that the evidence was insufficient to establish discrimination, causation of injury, or malice sufficient to support an award of punitive damages. Tolbert argues that defendants have waived their challenge to punitive damages because they neither objected to the court's instructions on such damages nor argued that the evidence was insufficient to warrant submission of that question to the jury. For the reasons that follow, we conclude that the granting of judgment as a matter of law was error.
 
 
 59
 A. Sufficiency of the Evidence of Discrimination
 
 
 60
 Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. §2000d. Section 1981 provides, inter alia, that, "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to... the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens." 42 U.S.C. §1981(a). In order to establish a claim based on either statute, the plaintiff must show, inter alia, that the defendant discriminated against him on the basis of race, see, e.g., Guardians Association v. Civil Service Commission, 463 U.S. 582, 602-03, 607 n.27 (1983); General Building Contractors Association, Inc. v. Pennsylvania, 458 U.S. 375, 391 (1982), that that discrimination was intentional, see, e.g., Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 265 (1977), and that the discrimination was a "'substantial'" or "'motivating factor'" for the defendant's actions, Gierlinger v. Gleason, 160 F.3d 858, 868 (2d Cir. 1998) (quoting Mt. Healthy City School District Board of Education v. Doyle, 429 U.S. 274, 287 (1977)).
 
 
 61
 A finding of discriminatory intent is a finding of fact, see, e.g., Pullman-Standard v. Swint, 456 U.S. 273, 287 90 (1982), as are findings of discrimination, see, e.g., Anderson v. Bessemer City, 470 U.S. 564, 573 (1985), and causation, see, e.g., Joseph v. New York City Board of Education, 171 F.3d 87, 93 (2d Cir.), cert. denied, 528 U.S. 876 (1999); Sedor v. Frank, 42 F.3d 741, 746 (2d Cir. 1994), cert. denied, 515 U.S. 1123 (1995). "[A]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts...." Washington v. Davis, 426 U.S. 229, 242 (1976). Such a finding may be supported by evidence that the defendant has given conflicting reasons for its treatment of the plaintiff. See generally EEOC v. Ethan Allen, Inc., 44 F.3d 116, 120 (2d Cir. 1994) (from discrepancies in employer's versions of the events and deliberations leading to termination of employment, "a reasonable juror could infer that the explanations given by [the employer] at trial were pretextual, developed over time to counter the evidence suggesting age discrimination"); Castleman v. Acme Boot Co., 959 F.2d 1417, 1423 (7th Cir. 1992) (jury is entitled to rely on "inconsistencies and less than credible assertions" in deciding that employer's proffered rationale for firing employee was pretext for age discrimination).
 
 
 62
 Before a case is submitted to the jury, a party may move pursuant to Rule 50 for judgment as a matter of law ("JMOL") on the ground that there is no legally sufficient evidentiary basis for a reasonable jury to find for the opposing party on an issue essential to a claim or defense. See Fed. R. Civ. P. 50(a)(1). The Rule requires the party making such a motion to "specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment." Fed. R. Civ. P. 50(a)(2). After an unfavorable verdict, Rule 50(b) allows the party to "renew" its motion. "The posttrial motion is limited to those grounds that were'specifically raised in the prior motion for [JMOL]'"; the movant is not permitted to add new grounds after trial. McCardle v. Haddad, 131 F.3d 43, 51 (2d Cir. 1997) (quoting Samuels v. Air Transport Local 504, 992 F.2d 12, 14 (2d Cir. 1993)); see, e.g., Kirsch v. Fleet Street, Ltd., 148 F.3d 149, 164 (2d Cir. 1998); Lambert v. Genesee Hospital, 10 F.3d 46, 53 54 (2d Cir. 1993), cert. denied, 511 U.S. 1052 (1994).
 
 
 63
 In ruling on a motion for JMOL, the trial court is required to
 
 
 64
 consider the evidence in the light most favorable to the party against whom the motion was made and to give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence. The court cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury.
 
 
 65
 Smith v. Lightning Bolt Productions, Inc., 861 F.2d 363, 367 (2d Cir. 1988) (internal quotation marks omitted); see also Kim v. Hurston, 182 F.3d 113, 117 (2d Cir. 1999); Piesco v. Koch, 12 F.3d 332, 343 (2d Cir. 1993). In making its evaluation, the court should "review all of the evidence in the record," Reeves v. Sanderson Plumbing Products, Inc., 120 S. Ct. 2097, 2110 (2000), but
 
 
 66
 it must disregard all evidence favorable to the moving party that the jury is not required to believe.... That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.
 
 
 67
 Id. (internal quotation marks omitted) (emphasis added). The same standards apply to an appellate court reviewing the grant of a Rule 50(b) motion. See, e.g., id.; Kim v. Hurston, 182 F.3d at 117; Galdieri-Ambrosini v. National Realty & Development Corp., 136 F.3d 276, 289 (2d Cir. 1998).
 
 
 68
 In the present case, the district court, though correctly stating the standards, did not view the evidence as a whole, or take it in the light most favorable to Tolbert, or disregard evidence favorable to the defense that the jury was not required to believe. For example, the court stated that Tolbert's "entire case against Professor Liebman is based on th[e] single" "statement made by Professor Liebman to the effect that the department 'cuts slack' for students who do not speak English as their native language," Opinion at 9, 8; that there was "a complete lack of evidence to support plaintiff's contention that Professor Liebman's comment demonstrates the existence of a racially discriminatory grading policy. All of the evidence is to the contrary," id. at 12; and that "defendants[] conclusively disproved" "the existence of any such policy," id.
 
 
 69
 Similarly, defendants in seeking to uphold the district court's granting of JMOL in their favor, argue that "the 'cut slack' remark was literally all the affirmative evidence that plaintiff had" (Defendants' brief on appeal at 20). They assert that there was no dispute that "slack" as to the quality of writing "was cut for everyone, not merely students of particular races, nationalities, or native languages" (id. at 15), and that "the testimony was undisputed that defendants ignored deficiencies in writing style when grading examinations" (id. at 19).
 
 
 70
 These statements by defendants and the court ignore the fact that the "cut slack" statement, unexplained at the October 6 Meeting, is susceptible to differing interpretations; they ignore Tolbert's circumstantial evidence and his testimony that he was told at the October 6 Meeting that he failed because of his writing style; and they do not reflect the record in the light most favorable to Tolbert. There is of course no question that the "cut slack" statement was the linchpin of Tolbert's case. It was a statement that openly expressed a differential in treatment in response to an explicit inquiry on the matter of ethnicity. The ultimate question was what was meant by the statement "we cut slack" with respect to Chinese students. Though defendants argue on appeal that the only meaning attributable to it is that to which Liebman and Cairns ultimately testified at trial, the district court termed the statement "ambiguous," Opinion at 11, and defense counsel at trial called it "very ambiguous" (Tr. 274). Such ambiguities are to be resolved by the factfinder, not by the court as a matter of law; and in parsing the meaning of that ambiguous statement, the jury was entitled to look both at the statement itself and at evidence of the circumstances in which it was made.
 
 
 71
 Was there a difference in the standards by which the Department graded examination essays? The jury could so infer from the ordinary meaning of to "cut slack," which is to apply a relaxed standard. Did that statement differentiate only between content and writing style, as defendants contended at trial, or did it instead refer to a differentiation between groups of students? The jury could infer that the "cut slack" statement referred to differentiation between groups, given Tolbert's testimony that the Department members at the October 6 Meeting had just "conceded that the factual content [of his essays] was indeed okay" (Tr. 57) and stated instead that the essays were flawed in writing style. Was the differentiation based on ethnicity? The jury could infer that it was, because the "cut slack" statement was the direct response to Tolbert's question as to how his writing could have been viewed as more flawed than that of the Chinese students. Was a differentiation based on ethnicity a Department policy? The jury could infer that it was from the facts that Liebman stated "we cut slack" (emphasis added); that he made that statement in the presence of Cairns, the Department chair, and Cairns not only did not inquire as to what Liebman meant but confirmed his statement by nodding in response to Meltzer's inquiry; and that the statement was not a stray remark in a corridor by a person who was not a decisionmaker, but rather was a statement by a professor in the Department in direct response to a question focusing on ethnicity, in a meeting called by the Department chair expressly for the purpose of discussing why Tolbert had been graded as he had.
 
 
 72
 The court's view that defendants had "conclusively disproved" the existence of a Departmental discriminatory policy plainly accepted as true the trial testimony of Liebman and certain of the testimony of Cairns. Acceptance of their versions, however, was not within the province of the court in ruling on a motion for judgment as a matter of law, for Liebman and Cairns plainly were not disinterested witnesses; they are defendants. Nor could Buchsbaum, though not a party, reasonably be considered a disinterested witness, for he was the coordinator of the College's Media Studies program. Further, Buchsbaum had graded all of Tolbert's essays and given a failing grade to each one; he had accused Tolbert of recycling old papers and an "astonish[ing]" (Tr. 367) plagiarism; he had rejected some of Tolbert's work "gleeful[ly]" (Tr. 26); and he had had disagreeable confrontations with Tolbert, leading to a refusal to accept communications from Tolbert except in writing. At trial, Liebman described Buchsbaum's attitude toward Tolbert as one of "consternation" (Tr. 334); Meltzer described Buchsbaum's demeanor upon seeing Tolbert at a non-school function as the facial expression of a person experiencing "acid reflux" (Tr. 254).
 
 
 73
 Even aside from defendants' obvious interest in the outcome of the litigation, the jury plainly was not compelled to accept at face value the meaning that defendants attributed to the "cut slack" statement at trial, and it had ample bases for skepticism. Cairns's testimony, for example, shifted before the jury's very eyes. Although Cairns ultimately testified that she did not remember any specific reference to Chinese students and had heard nothing at the October 6 Meeting that suggested to her that Chinese students or any ESL students "were being graded any differently from anybody else" (Tr. 231), she had begun her testimony by acknowledging that in that meeting Liebman had referred to "cutting certain students slack," and she agreed that "his statement concerning cutting particularly Chinese students a little slack was entirely appropriate" (Tr. 184 (emphases added)). Plainly Cairns's testimony was in tension with itself, and the jury was not required to believe the part of it that was favorable to Cairns.
 
 
 74
 In a similar vein, the evidence was that Liebman's trial testimony was in tension with the testimony he had given in his pretrial deposition. His trial testimony was that his "we cut slack" statement at the October 6 Meeting had meant solely to distinguish between content and grammar or syntax. At his deposition, taken 2½ years closer to the time of that meeting, Liebman had testified that he was not sure either of the words he had used in the meeting or the context in which they had been uttered. The jury was surely entitled to disbelieve Liebman's testimony at trial.
 
 
 75
 Further, in determining whether defendants had intentionally discriminated against Tolbert on the basis of race, the jury was entitled to view defendants' "we cut slack" statement in light of the evidence as a whole. That evidence included Tolbert's testimony that the Department had repeatedly changed the ground rules for his completion of the necessary course work. He had completed what he believed was required with respect to an internship, only to be informed thereafter that he must also write a paper on it. He asked about the nature of the required paper and proceeded to write one that conformed to what he had been told, only to be informed that that was not sufficient. He was told that the papers needed to resolve his Incomplete grades would be graded by the professors who had taught the respective courses, and was informed that Ibok had graded his paper a B, only to be informed thereafter that Buchsbaum was dissatisfied with it and insisted on a new paper. Meltzer testified that Cairns took the position that the Department does not "need to have objective [grading] criteria" and "can mark as [it] se[es] fit." (Tr. 263.) At the October 6 Meeting, the Department members began by telling Tolbert he had failed because of his essays' poor content; and when he refuted those criticisms, they again changed course and told him he had failed because of poor writing.
 
 
 76
 Plainly, the jury was not required to accept Tolbert's self-serving version of the October 6 Meeting or of his experiences with the Department, any more than it was required to accept defendants' self-serving disclaimers and belated interpretations. But it was permissible to credit the testimony of Tolbert and to discredit that of the defendants and to infer from the "we cut slack" statement, from the context and circumstances in which it was uttered, and from the evidence as a whole, that defendants intentionally discriminated against Tolbert on the basis of race. It is beyond the province of the district court, and of this Court, to second-guess those factual inferences and credibility assessments. We need not address defendants' suggestion that Tolbert may have been discriminated against solely "on the basis of language" (Tr. 274), given the jury's findings that defendants discriminated against Tolbert "based on his race" (Tr. 479 (verdict against the College); id. ("based upon plaintiff's race" (verdict against Liebman)); id. ("based on plaintiff's race" (verdict against Cairns))).
 
 
 77
 Finally, we reject the defense contention that it was impossible for defendants to have discriminated against Tolbert in the grading of his essays even had they wanted to, because of the blind-grading system. Though defendants argue unqualifiedly that no grader could know the author of a given essay (and Cairns testified "I can swear that there is absolutely no way they could have known" (Tr. 237)), there was evidence that one of Tolbert's essays made reference to a "recent[]" paper for "Ibok" (Tr. 383). Buchsbaum, who graded all four of Tolbert's essays, testified that he did not recall whether he had realized that the essay containing that reference was written by Tolbert, but he conceded, "If I thought about it I would have thought that, yes" (Tr. 384); and he conceded that he "probably" could "identify similar handwriting" (Tr. 392). The jury could also infer that the very ability of the essay graders to "cut slack" for the Chinese students meant that the graders could tell the ethnicity of the essays' authors. The fact that only six students took the examination limited the difficulty that a reader would have in distinguishing Tolbert's essays from those of the other students.
 
 
 78
 Thus, the district court itself noted that there was "testimony which cast doubt on whether [the grading] system was, in fact, truly anonymous in this instance." Opinion at 7 n.4. Although the court went on to infer that a lack of anonymity, as well as a lack of objective grading criteria, "do not support plaintiff's case," id. at 13, the matter of which of permissible inferences were to be drawn from that evidence was solely within the province of the jury.
 
 
 79
 In sum, the evidence permitted inferences, inter alia, that the Department believed itself free to grade arbitrarily; that it repeatedly altered the prerequisites Tolbert was required to meet in order to get his degree; that it took inconsistent positions on why Tolbert had failed his examination essays; that the Department had intentionally injected consideration of ethnicity into its exam-grading decisions and applied a more rigorous standard to Tolbert than to students of other ethnicity; that Buchsbaum, coordinator of the program, had made a comment to Tolbert about blacks "always seem[ing]" to be "second rate" (Tr. 33), and had openly taken pleasure in rejecting some of Tolbert's work; and that Buchsbaum had failed Tolbert on each of his essays and could have known they were written by Tolbert. Given the record as a whole, defendants were not entitled to judgment as a matter of law for lack of proof of intentional racial discrimination.
 
 
 80
 B. Causation and the Verdict Denying Compensatory Damages
 
 
 81
 Defendants also urge us to uphold the entry of judgment as a matter of law on the basis of the jury's refusal to award Tolbert compensatory damages, arguing that "the only rational construction of [the verdict] is that the defendants' actions, even if unlawful, were not the proximate cause of any harm to plaintiff because he would have failed his comprehensive examinations regardless of those actions" (Defendants' brief on appeal at 3), and that their actions thus "caused plaintiff no legally cognizable injury" (id. at 24). This argument is supported neither by law nor by the record.
 
 
 82
 First, a plaintiff who has proven a civil rights violation, but has not proven actual compensable injury, is entitled as a matter of law to an award of nominal damages. See, e.g., Robinson v. Cattaraugus County, 147 F.3d 153, 162 (2d Cir. 1998); LeBlanc-Sternberg v. Fletcher, 67 F.3d 412, 431 (2d Cir. 1995). Even if the plaintiff fails to persuade the jury that the proven violation caused him an injury that is compensable, the defendant who committed the violation is not entitled to judgment as a matter of law.
 
 
 83
 Second, defendants' contention has no greater merit if it is viewed as an argument that the jury's special verdict answers are inconsistent with one another. When such an inconsistency occurs, proper deference to the parties' Seventh Amendment rights to trial by jury precludes entry of a judgment that disregards any material jury finding. See Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd., 369 U.S. 355, 364 (1962); Fiacco v. City of Rensselaer, 783 F.2d 319, 325 (2d Cir. 1986), cert. denied, 480 U.S. 922 (1987); Crane v. Consolidated Rail Corp., 731 F.2d 1042, 1050-51 (2d Cir.), cert. denied, 469 U.S. 854 (1984). The correct course, if the answers were ineluctably inconsistent, would not be to enter judgment as a matter of law but rather to order a new trial. See, e.g., Brooks v. Brattleboro Memorial Hospital, 958 F.2d 525, 529 (2d Cir. 1992); Auwood v. Harry Brandt Booking Office, Inc., 850 F.2d 884, 891 (2d Cir. 1988).
 
 
 84
 Third, where the special verdict answers appear to be inconsistent but "there is a view of the case that makes the jury's answer[s]... consistent, they must be resolved that way." Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd., 369 U.S. at 364; see, e.g., Auwood v. Harry Brandt Booking Office, Inc., 850 F.2d at 891; 9A C. Wright & A. Miller, Federal Practice and Procedure §2510, at 200 01 (2d ed. 1995). In seeking consistency, we bear in mind that the jury was entitled to believe some parts and disbelieve other parts of the testimony of any given witness. See, e.g., Robinson v. Cattaraugus County, 147 F.3d at 160; Fiacco v. City of Rensselaer, 783 F.2d at 325.
 
 
 85
 In the present case, we have little difficulty in determining that the jury's interrogatory answers are consistent, given the trial court's instructions and Tolbert's evidence as to damages. The jury was instructed that if it found defendants to have discriminated against Tolbert on the basis of race, it could award compensatory damages for injuries he proved were proximately caused by their wrongful conduct; but it was cautioned that while a plaintiff is "not require[d]... to prove the amount of his losses with mathematical precision" (Tr. 468), the jury "must not... engage in arbitrary guesswork" (id.).
 
 
 86
 In response to each of the three liability questions posed on the special verdict form, the jury expressly found that Liebman, Cairns, and the College had discriminated against Tolbert based on his race. It seems plain that the jury credited the testimony of Tolbert and Meltzer as to the statements made at the October 6 Meeting and drew inferences in Tolbert's favor from other evidence in the record. We think it also likely that the jury simply found that Tolbert's proof of his losses was guesswork. Although defendants argue in this Court that there was "undisputed evidence that plaintiff lost $12,000 to $15,000 in salary and benefits that he would have earned if he had been awarded a master's degree in 1993 rather than in 1996, plus about $13,000 in additional out-of-pocket expenses" (Defendants' brief on appeal at 24), they cite only to Tolbert's testimony, and that testimony was hardly so concrete. Tolbert testified that the delay in obtaining his Master's degree caused him to be "stuck at a certain pay level" (Tr. 63), and that his damages were "constantly accruing" (Tr. 64). However, he was unprepared to state the amount:
 
 
 87
 Q. So in terms of actual pay, have you yourself sat down and figured out how much pay you lost as a result of not getting your masters through the communications department?
 
 
 88
 A. No, but it can be done.
 
 
 89
 Q. Can you tell us from a yearly basis how much you believe you lost?
 
 
 90
 A. Well, just off the top of my head, I'd say starting back there, it might have been like maybe 4to 5,000 dollars difference and it would have incrementally gone higher....
 
 
 91
 (Id.) Although Tolbert's attorney's questions thereafter assumed an annual loss of $4-5,000, the jury was instructed, properly, that counsel's questions are not evidence. It was entirely appropriate for the jury to conclude that Tolbert's actual testimony as to his admittedly uncalculated loss of what "might have been like maybe" $4-5,000, "just off the top of [his] head," was so flimsy as to make the calculation of a compensatory damages award by the jury a matter of speculation.
 
 
 92
 Thus, we see no inconsistency in the jury's verdict and no basis for setting aside the findings of liability.
 
 C. Punitive Damages
 
 93
 Finally, defendants contend that, in any event, the award of punitive damages cannot stand. They argue principally that the evidence of malice, reckless indifference, or outrageous conduct was insufficient. The College also suggests, in a single sentence, that such damages are not available on a Title VI claim. Neither ground is properly before us. We address them in reverse order.
 
 
 94
 1. Waiver of the College's Title VI Argument
 
 
 95
 An appellee is required to set out in his brief to the court of appeals "a statement of the issues presented for review," unless he is satisfied with the appellant's statement of the issues, Fed. R. App. P. 28(b) and 28(a)(5), along with his "contentions and the reasons for them," Fed. R. App. P. 28(b) and 28(a)(9). A contention is not sufficiently presented for appeal if it is conclusorily asserted only in a footnote. See, e.g., United States v. Restrepo, 986 F.2d 1462, 1463 (2d Cir.), cert. denied, 510 U.S. 843 (1993); cf. Cooper v. Parsky, 140 F.3d 433, 441 (2d Cir. 1998) (where the only mention of personal jurisdiction appeared in a footnote in appellant's reply brief and stated simply that dismissal for lack of personal jurisdiction without a hearing or discovery was error and cited a single case, the issue was not properly presented for review). It is a "settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." United States v. Zannino, 895 F.2d 1, 17 (1st Cir.), cert. denied, 494 U.S. 1082 (1990).
 
 
 96
 In defendants' brief on appeal in the present case, their statement of the issues for review makes no reference to the availability of punitive damages as a matter of law under Title VI. To the extent that their statement of the issues focuses on punitive damages at all, it states the issue as merely "[w]hether the claimed evidence of actual malice, reckless indifference, or outrageous conduct was insufficient as a matter of law to permit the issue of punitive damages to be submitted to the jury" (Defendants' brief on appeal at 3).
 
 
 97
 The suggestion that punitive damages are never available in a private action under Title VI appears in defendants' brief only in a footnote stating the proposition conclusorily in a single sentence. The footnote cites but a single case, Moreno v. Consolidated Rail Corp., 99 F.3d 782, 789 (6th Cir. 1996) (en banc), which held that punitive damages are not available under §504 of the Rehabilitation Act of 1973, 29 U.S.C. §794, relying in large part on the fact that punitive damages are expressly authorized for a claim brought under a different section of the Rehabilitation Act. While the Moreno court also found its view supported by the Rehabilitation Act's incorporation of the remedies of Title VI, and by its conclusion that the Sixth Circuit would not infer from the statutory scheme and legislative history a Congressional intent to permit punitive damages in a private action for violation of Title VI, see 99 F.3d at 790-92, other courts have reached the opposite conclusion, see, e.g., Pandazides v. Virginia Board of Education, 13 F.3d 823, 830 (4th Cir. 1994) (in actions under Title VI and the Rehabilitation Act, "lower courts have split over the availability of compensatory or punitive damages. See 3A Larson, Employment Discrimination §106.37 & nn. 64-65 (1990 & Supp.1993) (collecting cases)."). Defendants' brief on appeal contains no analysis or discussion of the issue.
 
 
 98
 We note also that the availability of punitive damages under Title VI received no greater attention from defendants in the district court. The only claim remaining in the case against the College was the Title VI claim. Yet the College did not ask that the jury be instructed that the law did not allow an award of punitive damages against the College; nor did the College object to the court's instruction, discussed in Part II.D. below, that if all defendants united in discriminating against Tolbert, punitive damages could be awarded jointly against all defendants. And although defendants included a "seven-line footnote" on the subject in a posttrial brief, Opinion at 5, the district court stated that they had been "of no help in analyzing" the issue, id. The district court found it unnecessary to reach the issue in light of its conclusion as to the insufficiency of the evidence of liability.
 
 
 99
 We conclude that defendants' single perfunctory sentence in their appellate brief does not properly present the Title VI punitive damages issue for review. The issue has thus been waived, and we leave its resolution for another day, in a case in which it is presented properly.
 
 
 100
 2. Waiver of the Punitive Damages Evidentiary Challenge
 
 
 101
 Defendants' evidentiary challenge to the jury's award of punitive damages, in contrast to their Title VI legal argument, has been adequately briefed on this appeal. It nonetheless is not properly before us because defendants did not argue that the evidence was insufficient to support punitive damages in their Rule 50(a) motion for JMOL.
 
 
 102
 A motion for judgment as a matter of law "must at least identify the specific element that the defendant contends is insufficiently supported." Galdieri-Ambrosini v. National Realty & Development Corp., 136 F.3d at 286; see, e.g., Lambert v. Genesee Hospital, 10 F.3d at 54 ("the specificity requirement is obligatory"). The rationale is that the motion must be sufficient to inform the opposing party of the precise issue as to which more evidence is needed in order to warrant its submission to the jury. See Fed. R. Civ. P. 50 Advisory Committee Note (1991). A motion that identifies one element of a claim is insufficient to permit the district court to grant JMOL for lack of proof of some other, unspecified, element, and is insufficient to permit appellate review of the sufficiency of the evidence as to the unspecified element, see, e.g., Kirsch v. Fleet Street, Ltd., 148 F.3d at 164; Cruz v. Local Union No. 3 of the International Brotherhood of Electrical Workers, 34 F.3d 1148, 1155 (2d Cir. 1994); Baskin v. Hawley, 807 F.2d 1120, 1134 (2d Cir. 1986), unless review is required in order to prevent manifest injustice, see, e.g., Kirsch v. Fleet Street, Ltd., 148 F.3d at 164; Galdieri-Ambrosini v. National Realty & Development Corp., 136 F.3d at 287.
 
 
 103
 An award of punitive damages is "a discretionary moral judgment" that the defendant has engaged in conduct that is so reprehensible that it warrants punishment. Smith v. Wade, 461 U.S. 30, 52 (1983). Punitive damages may be awarded for a civil rights claim if "the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." Id. at 56 (discussing actions brought under §1983) (emphasis added). These terms "pertain to the [defendant's] knowledge that it may be acting in violation of federal law, not its awareness that it is engaging in discrimination." Kolstad v. American Dental Association, 527 U.S. 526, 535 (1999) (interpreting 42 U.S.C. §1981a(b)(1)).
 
 
 104
 In the present case, defendants' Rule 50(a) motion for JMOL did not challenge the sufficiency of Tolbert's evidence with respect to punitive damages. Rather, as described in Part I.D. above, defendants moved for JMOL solely on the ground that Tolbert had failed to prove that the discrimination was based on race. There was no mention whatever in that motion of punitive damages; nor did defendants suggest that there was insufficient proof that they had a mental state that could justify an award of such damages. Indeed, the very argument presented by defendants' attorney in support of his contention that there was no evidence of discrimination on the basis of race raised the specter of at least a reckless or callous indifference to Tolbert's rights. Defense counsel stated that "[i]f [Tolbert] proved anything" against defendants it was "that they just didn't like Derek Tolbert and were out to get him because of personal animus against him because they didn't like the way he acted" (Tr. 273 (emphases added)), and that they "may perhaps, if they were able to figure out whose exam it was, have retaliated against him on account of pure personal animus" (Tr. 274 (emphasis added)). These statements plainly could not have alerted Tolbert to any defense contention that he had failed to produce evidence from which a reckless or callous indifference to his rights could be inferred. Accordingly, defendants did not preserve for appellate review their present challenge to the sufficiency of the evidence to support a punitive damages award; and in light of defendants' own arguments at trial, we cannot conclude that excusing that defect is needed in order to prevent injustice.
 
 D. Remand for Entry of an Amended Judgment
 
 105
 In light of the foregoing, we conclude that defendants were not entitled to judgment as a matter of law. The jury's verdict should be reinstated, and an amended judgment entered awarding Tolbert both nominal damages and punitive damages.
 
 
 106
 We note that it is unclear whether there is disagreement as to the extent of the punitive damages award. Defendants describe it as a $50,000 award against the defendants "jointly and severally" (Defendants' brief on appeal at 2), whereas Tolbert describes it as an award of "$50,000 in punitive damages against each of the defendants" (Tolbert brief on appeal at 2). We construe the verdict as awarding a total of $50,000 against Liebman, Cairns, and the College, jointly and severally. The court clerk read the verdict on punitive damages as follows:
 
 
 107
 Question 6, what amount of punitive damages, if any, do you award for plaintiff and against which defendants should such damages be assessed.
 
 
 108
 Amount: $50,000 dollars and the defendants indicated are Queens College, Stuart Liebman and Helen Smith Cairns.
 
 
 109
 (Tr. 480.) The jury had been instructed that if it found that the defendants had united in intentionally violating Tolbert's rights, they could be "treat[ed]... jointly for purposes of... damages," and the jury could "simply determine the overall amount of damages for which they are liable, without breaking that figure down into individual percentages." (Tr. 466.) We see no indication that the jury meant to award punitive damages in excess of $50,000. Accordingly, the amended judgment should specify that the $50,000 punitive damages award is against the College, Liebman, and Cairns "jointly and severally."
 
 
 110
 Finally, we note that Tolbert, having prevailed, is entitled to apply for an award of attorneys' fees pursuant to 42 U.S.C. §1988, both for the proceedings in the district court and for the present and prior appeals to this Court. See, e.g., Fassett v. Haeckel, 936 F.2d 118, 121-22 (2d Cir. 1991) (per curiam); Orchano v. Advanced Recovery, Inc., 107 F.3d 94, 97 (2d Cir. 1997). We leave it to the district court to determine the reasonable fees that may be awarded for all stages of the litigation.
 
 CONCLUSION
 
 111
 We have considered all of defendants' arguments in support of the judgment, to the extent that they are properly before us, and have found them to be without merit. The judgment is reversed, and the matter is remanded for entry of an amended judgment reinstating the jury's verdict awarding Tolbert $50,000 in punitive damages, and awarding him $1 in nominal damages.
 
 
 
 NOTE:
 
 
 *
 Honorable Bernard A. Friedman, of the United States District Court for the Eastern District of Michigan, sitting by designation.