# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT
_____

Nos. 00-1029/00-1030
_____

Jeffrey Gorman,                          *
                                         *
    Appellant/Cross-Appellee,    *
                                         *
v.                                       *
                                         *
Richard Easley, in his official capacity *
as Chief of Police of the Kansas City,   *
Missouri Police Department; Dr. Stacey   *
Daniels-Young, in her official           *
capacity as member of the Board of       *
Police Commissioners of Kansas City,     *   Appeal from the United States
Missouri; Jeffrey J. Simon, in his       *   District Court for the Western
official capacity as member of the       *   District of Missouri.
Board of Police Commissioners of         *
Kansas City, Missouri; Joseph J.         *
Mulvihill, in his official capacity as   *
member of the Board of Police            *
Commissioners of Kansas City,            *
Missouri; Dennis C. Eckhold, in his      *
official capacity as member of the       *
Board of Police Commissioners of         *
Kansas City, Missouri; Kay Barnes, in    *
her official capacity as member of the   *
Board of Police Commissioners of         *
Kansas City, Missouri; Neil Becker, in   *
his official capacity as a member of the *
Kansas City Police Department,           *
                                         *
    Appellees/Cross-Appellants.  *

_____

Submitted: January 8, 2001

Filed: June 13, 2001
Amended as per the judgment of September 6, 2002

_____

Before BEAM, MORRIS SHEPPARD ARNOLD, Circuit Judges and ALSOP,[1] District Judge.

_____

BEAM, Circuit Judge.

We have twice before heard appeals in this case. It has now been tried before a jury, which rendered a verdict against the defendant appellees (collectively "the Police Board" or "the Board"). Jeffrey Gorman now appeals the district court's post-trial ruling that punitive damages are not available under the Rehabilitation Act and the Americans with Disability Act. The Board, for its part, asserts Eleventh Amendment immunity, and appeals various trial court rulings. We reverse and remand for further proceedings.

I.

A January 1988 auto accident left Jeffrey Gorman a paraplegic. He lacks voluntary control over his lower torso and legs, including his bladder. His inability to steady himself with his abdominal muscles and legs confines him to a wheelchair specially designed to keep him upright. He must also wear a catheter attached to a urine bag around his waist, which must be emptied in order to prevent urine from backing up into his body and causing an infection or a kidney disorder.

_____

[1]The Honorable Donald D. Alsop, United States District Judge for the District of Minnesota, sitting by designation.

One Saturday night in May 1992, Gorman and a friend were in the Westport area of Kansas City, Missouri, where they entered a dance club called "Guitars and Cadillacs." While in the club, the two became involved in an altercation with a bouncer, which ultimately resulted in Gorman's forceful ejection from the premises. Outside, Gorman approached several police officers, hoping they would intercede on his behalf. In fact, the officers were off-duty and working as private security for Westport. The officers told Gorman that he had to leave. When he refused, they placed him under arrest for trespass.

While waiting for the police van, Gorman told the officers that he had to go to the restroom to empty his full urine bag, but was told to wait until he got to the station. When the van arrived it lacked wheelchair locks, which would have permitted Gorman's transportation in his chair. Rather, it contained only a narrow bench. Gorman told the officers that he could not possibly ride in it. Given his inability to stay upright without his wheelchair, Gorman thought he would fall from the bench. Gorman testified that he told the officers this, that he told them how to lift him from his chair, and that he needed his molded cushion. Regardless, the officers placed Gorman on the bench and used a seatbelt to strap him in. The seatbelt did not properly hold Gorman upright, and it lay across his already full urine bag. Gorman testified that after he complained about the seatbelt, the officers loosened it, and used Gorman's own belt to strap him to the mesh behind the bench in order to hold him upright. The officers were unable to fold the wheelchair, and placed it, unfolded, in the back of the van.[2]

Officer Becker, the van driver and only on-duty officer involved, then drove the van away from the scene. Gorman testified that his body swayed with every turn

[2]Almost every element of what happened that night was contested by the defendants, whose testimony was that Gorman did not instruct the officers how to transport him, offered no input whatsoever, and was thoroughly drunk and belligerent. As Gorman prevailed below, we present his version of events.

and acceleration.  Gorman admitted that he released his seatbelt out of concern over the pressure it was placing on his urine bag.  Eventually, the other belt also came undone and Gorman fell to the van floor.  The impact from the fall exploded Gorman's urine bag, soaking him with his own urine.  Noticing that Gorman had fallen, Officer Becker stopped the van.  Unable to lift Gorman by himself, Officer Becker tied him to a support in the back of the van for the duration of the trip.  The trip also damaged the wheelchair.  After arriving at the station, Gorman was booked, processed and released.  He was subsequently convicted of misdemeanor trespass.

After these events, Gorman began having medical difficulties.  He suffered a bladder infection from urine backing up into his system and began suffering serious lower back pain.  Whereas prior to that night he had been active and pain-free, his injuries left him unable to work a full day, suffering frequent pain, uncontrollable spasms in his paralyzed areas, and shoulder problems.  Expert testimony suggested that these injuries and the resulting pain are permanent.

Gorman sued the Police Board under Title V, section 504 of the Rehabilitation Act, 29 U.S.C. § 794 ("section 504"), and Title II, section 202 of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132 ("section 202").  Section 504 prohibits disability-based discrimination in any public program receiving federal funds.  Section 202 more generally prohibits disability-based discrimination in any public program or services regardless of the receipt of federal funds.  In Gorman v. Bartch, 152 F.3d 907, 912-13 (8th Cir. 1998), we held that despite Gorman's involuntary participation in the public services provided to detainees, he could pursue his claim under sections 504 and 202.  After a trial, a jury found the defendants liable and awarded Gorman actual damages of $1,034,817.33 and punitive damages of $1,200,000.[3]  This appeal followed.

---

[3]The district court submitted Gorman's ADA and Rehabilitation Act claims in a unified instruction.  Gorman can therefore prevail if the evidence supports the jury's finding under either Act.

II.

We begin with the Police Board's claim of sovereign immunity. The Board interposes as dispositive our holding in Alsbrook v. City of Maumelle, 184 F.3d 999 (8th Cir. 1999), cert. denied sub nom., Alsbrook v. Arkansas, 529 U.S. 1001 (2000), that the Eleventh Amendment bars suits against the states in federal court under section 202. Gorman argues the Police Board's failure to similarly address his section 504 claim renders that argument moot. However, the Eleventh Amendment implicates our jurisdiction, which we are obliged to explore even where the parties fail to do so. Long v. Bureau of Reclamation, 236 F.3d 910, 916 (8th Cir. 2001). We are therefore bound to consider whether sovereign immunity prevents Gorman from bringing a claim against the Police Board under either statute. Alsbrook alone does not dispose of that issue, for it leaves us with two questions: whether sovereign immunity similarly bars suits against a state in federal court under section 504; and whether the Police Board constitutes an arm of the state entitled to sovereign immunity. Because we resolve the latter question in the negative, we do not reach the former.

Sovereign immunity extends to states and "arms" of the state, but not to local governments. Alden v. Maine, 527 U.S. 706, 756 (1999); Merrill Lynch, Pierce, Fenner and Smith, Inc. v. Nixon, 210 F.3d 814, 819 (8th Cir.), cert. denied, 121 S. Ct. 383 (2000). Whether an entity constitutes such an "arm" turns on its relationship to the state under state law.[4] Regents of the Univ. of Cal. v. Doe, 519 U.S. 425, 430-31

---

[4]Gorman argues that the denial of Eleventh Amendment immunity to bi-state agencies organized under federal law in Hess v. Port Authority Trans-Hudson Corp., 513 U.S. 30, 38 & n.8 (1994), undercuts the Police Board's claim to immunity as a creature of state law. This argument could not be more wrong. Organization under state law, rather than federal law, makes it more likely that an agency is an arm of the state.

& n.5 (1997); <u>Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle</u>, 429 U.S. 274, 280 (1977).

In our own "arm of the state" jurisprudence, we have looked generally to three factors: (1) an agency's powers and characteristics under state law; (2) an agency's relationship to the state–its autonomy from the state and degree of control over its own affairs, and (3) whether any award would flow from the state treasury. <u>Treleven v. University of Minn.</u>, 73 F.3d 816, 818 (8th Cir. 1996); <u>accord</u> <u>Hadley v. North Ark. Cmty. Tech. Coll.</u>, 76 F.3d 1437 (8th Cir. 1996) (finding community college to be an arm of the state based upon the state's ultimate financial liability and the institution's status under state law); <u>Greenwood v. Ross</u>, 778 F.2d 448 (8th Cir. 1985) (directing inquiry to degree of local autonomy and control and whether suit will draw payment from the state treasury).  Because a state may only waive its immunity upon an "unequivocally expressed . . . clear declaration" of an intent to do so, we give particular heed to a state's treatment of its subdivisions under its own laws. <u>College Savs. Bank  v. Florida Prepaid Postsecondary Educ. Expense Bd.</u>, 527 U.S. 666, 676 (1999) (citations omitted). Likewise, we give substantial weight to whether litigation against a particular entity would draw on the public fisc. <u>Hess v. Port Auth. Trans-Hudson Corp.</u>, 513 U.S. 30, 38 (1994); <u>Regents</u>, 519 U.S. at 430.

Our resolution of this issue in this case is guided by two holdings.  The first is the Supreme Court's ruling in <u>Auer v. Robbins</u>, 519 U.S. 452, 456 n.1 (1997), that the St. Louis Board of Police is not "an arm of the state."  There, the Court noted that "[w]hile the Governor appoints four of the board's five members, the city of St. Louis is responsible for the board's financial liabilities, and the board is not subject to the State's direction or control in any other respect.  It is therefore not an 'arm of the State' for Eleventh Amendment purposes." <u>Id.</u> (citations omitted).

The elements relied upon by the Supreme Court in <u>Auer</u> were recently reaffirmed in <u>Smith v. Missouri</u>, No. W.D. 58882, 2001 WL 471937, at *1 (Mo. Ct.

App. May 7, 2001), where the Missouri Court of Appeals addressed the question whether members of the St. Louis Police Board and police officers with the City of St. Louis were entitled to coverage under the Missouri State Legal Expense Fund. That fund makes money available for payment of damages levied against any state agency or officer or employee thereof. Id. at *2. The court undertook a rigorous analysis of the St. Louis Board of Police in order to determine whether it was the sort of state agency the creators of the Legal Expense Fund had intended to include under its coverage. The court noted that the Board is a creature of state, and not local law. Id. at *4. Moreover, it noted that the Board was intentionally set up to be above local political influence, and to that end, as the Supreme Court noted, four of the Board's five members are appointed by the Missouri Governor. Id. at *3-4. However, the court went on to note that the State's funding mechanism ensures that the St. Louis Board is funded by the people of St. Louis. Id. at *5-6. Finally, the court examined the St. Louis Board's functions and purpose, which relate primarily to the city.[5] In particular, the court noted that the state has no day-to-day control over the St. Louis Board. Id. at *7-*8. In sum, the Missouri Court of Appeals concluded that at best, the St. Louis Board is a "hybrid agency." Id. at *6-8. As regards the Legal Expense Fund, the court concluded that "the legislature's intent in creating and maintaining the Fund is to provide coverage to those agencies and employees whose duties and actions directly impact the whole state and over which the state retains more direct control." Id. at 8. The St. Louis Board not being such an entity, the court concluded the state has no obligation to pay judgments against its members or officers. Id. at *11.

The Kansas City Board, at issue in this case, is similarly a creature of Missouri state law, and is managed in a substantially similar manner. Mo. Ann. Stat. §§ 84.350 - 84.870. Its functions are primarily local. Its structure mirrors that which the

---

[5]A geographically-limited scope of responsibility does not necessarily deprive an entity of Eleventh Amendment immunity. See, e.g., Power v. Summers, 226 F.3d 815, 818 (7th Cir. 2000).

Supreme Court found in <u>Auer</u> to not be an arm of the state. Moreover, as the Missouri Court of Appeals confirmed in <u>Smith</u>, and as the Supreme Court stated in <u>Auer</u>, Board members are not subject to reimbursement from the state treasury for any money judgments rendered against them. Because for the purposes at issue in this case relevant state law treats entities such as the Board as not being a state agency, and because the state is not responsible for judgments against it, we conclude that the Kansas City Board does not constitute an arm of the state for purposes of Eleventh Amendment immunity.

III.

Gorman appeals the district court's post-trial ruling that neither section 504 nor section 202 permits punitive damages. We have twice permitted monetary remedies under section 504, <u>Rodgers v. Magnet Cove Pub. Schs.</u>, 34 F.3d 642 (8th Cir. 1994); <u>Miener v. Missouri</u>, 673 F.2d 969 (8th Cir. 1982), but the availability of punitive damages remains an open question, <u>Gorman v. Bartch</u>, 152 F.3d 907, 910 n.2 (8th Cir. 1998). This raises a question that only one other circuit has addressed. <u>See</u> <u>Moreno v. Consolidated Rail Corp.</u>, 99 F.3d 782 (6th Cir. 1996) (holding that punitive damages are not available under section 504). While we are sympathetic to the Sixth Circuit's conclusion, we find it foreclosed by controlling precedent.

Sections 504 and 202 both borrow their remedies from Title VI of the 1964 Civil Rights Act. 29 U.S.C. § 794a(a)(2); 42 U.S.C. § 12133. The pertinent question, therefore, is what remedies Title VI permits. Unfortunately, Title VI expressly provides neither a private cause of action nor remedies for such an action. <u>See</u> 42 U.S.C. §§ 2000d <u>et seq.</u> In <u>Cannon v. University of Chicago</u>, 441 U.S. 677, 694-703 (1979), however, the Supreme Court held that Title IX of the Education Amendments of 1972 created an implied cause of action in its protected class. In doing so, the Supreme Court relied heavily on the fact that Title IX had been modeled on Title VI. The Court assumed Congress knew that Title VI had been interpreted by some lower

courts to contain an implied cause of action. Id. at 696-97. Therefore, the Court concluded, Congress must have intended Title IX to similarly include an implied cause of action. This reading has since been turned around to conclude that Title VI must also contain an implied cause of action. Lane v. Pena, 518 U.S. 187, 191 (1996); Guardians Ass'n v. Civil Serv. Comm'n, 463 U.S. 582, 597, 612, 615-16, 635-36 (1983) (seven members of the court recognizing implied action in Title VI in fragmented opinions). For our part, we have twice permitted damages under section 504, thereby corroborating, albeit without discussion, the notion that Title VI contains an implied cause of action. Rodgers, 34 F.3d 642; Miener, 673 F.2d 969.

We turn next to Franklin v. Gwinnett County Public Schools, 503 U.S. 60 (1992), which considered the remedies available under the cause of action implied in Title IX. There, the Court affirmed the rule, articulated earlier in Bell v. Hood, 327 U.S. 678, 684 (1946), that "absent clear direction to the contrary by Congress, the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute." Franklin, 503 U.S. at 70-71. The Supreme Court has long made clear that punitive damages are an integral part of the common law tradition and the judicial arsenal. See Pacific Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 15-18 (1991) (reviewing history of punitive damages from Blackstone through the English and American courts); Day v. Woodworth, 54 U.S. 362, 370 (1852) (noting well established common law principle that juries may exact "exemplary, punitive or vindictive" damages). Punitive damages, therefore, fall within the panoply of remedies usually available to American courts. Given an implied cause of action in Title VI, Franklin compels the conclusion that absent express congressional statement to the contrary, Title VI also affords all appropriate remedies, including punitive damages.[6]

---

[6]The availability of additional remedies is not precluded by Congress' express provision in Title VI of administrative remedies. It is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it. Transamerica Mortgage Advisors, Inc.

The Court in Franklin next took up "whether Congress intended to limit application of this general principle in the enforcement of Title IX." 503 U.S. at 71. Because the cause of action in question was implied rather than expressed, the Court put aside what it considered a pointless discussion of legislative history.[7] Id. Rather, it looked to the judicial backdrop against which Congress had legislated. The Court observed that "[i]n the years before and after Congress enacted this statute, the Court followed a common-law tradition and regarded the denial of a remedy as the exception rather than the rule." Id. (quotation and brackets omitted). Once again indulging the assumption that Congress legislates in light of prevailing precedent, the Court found Congress to have intended the availability of all remedies. The Court then reviewed Congress' subsequent treatment of Title IX. In both 1986 and 1987, Congress amended Title IX without disturbing either the Court's holding in Cannon, that Title IX afforded a private remedy, or limiting the availability of remedies thereunder. In fact, the language of the 1986 amendment impliedly recognized the existence of a private cause of action. Id. at 72-73. The Court concluded, "[o]ur reading of the two amendments to Title IX enacted after Cannon leads us to conclude that Congress did not intend to limit the remedies available in a suit brought under Title IX." Id. at 72.

Application of Franklin's methodology to this case must begin with the enactment of Title VI in 1964. Cannon and our own holdings in Rodgers and Miener compel the conclusion that in 1964 Congress created an implied cause of action in

---

(TAMA) v. Lewis, 444 U.S. 11, 19 (1979). However, Title IX uses the same textual structure and remedies, yet in Franklin the Court found the implied private cause of action to sustain an award of monetary damages. This follows only if the administrative and private causes of action are separate and distinct such that a limitation on one does not operate against the other.

[7]That the cause of action was implied did not preclude the availability of remedies as the latter is analytically distinct from the question of whether a cause of action exists at all. Franklin, 503 U.S. at 65-66.

Title VI.[8]  At that time, the rule in <u>Bell</u>, relied on in <u>Franklin</u>, that a cause of action affords all appropriate remedies unless expressly limited, was alive and well.  As in <u>Franklin</u>, we must therefore conclude that Congress assumed the availability of all remedies, including punitive damages, under Title VI.  Congress has not since amended Title VI to limit any cause of action implied thereunder, nor the remedies that might accompany such a cause of action.  Congress extended the remedies available under Title VI to section 504 in 1978, 29 U.S.C. § 794a, and then to section 202 in 1990, 42 U.S.C. § 12133.  Congress has never expressly limited the remedies available under those sections either.  Therefore, logic dictates, the full panoply of remedies available under Title VI, including punitive damages, must be available under sections 504 and 202.

The Sixth Circuit reached the contrary conclusion in <u>Moreno</u>, 99 F.3d 782.  It relied largely on two concerns.  First, it noted that since the enactment of these various sections, lower federal courts have been in near unanimity that they do not support punitive awards. <u>Id.</u> at 789-91.  Second, given this fact, it pointed to the Civil Rights Act of 1991 as proof that Congress itself did not intend the availability of punitive damages. <u>Id.</u> at 790.  It additionally pointed to this same evidence to support the proposition that punitive damages would not be "appropriate" in that case. <u>Id.</u> at 791-92.

We are sympathetic to the Sixth Circuit's concerns, but find its methodology and conclusions foreclosed by <u>Cannon</u> and <u>Franklin</u>.  The Sixth Circuit first pointed to the 1986, 1987 and 1991 amendments to the Rehabilitation Act and the ADA,

_____

[8]When a court "implies" a cause of action it does not "create" it, but rather "discovers" it in an act of statutory construction. <u>See, e.g.</u>, <u>Franklin</u>, 503 U.S. 71-72; <u>J. I. Case Co. v. Borak</u>, 377 U.S. 426, 430-31 (1964).  The upshot of this understanding is that the cause of action has always existed, despite having lain dormant.  This logic holds for any judicial statutory interpretation–even those which change pre-existing interpretations.  Regardless of the merits of this understanding, it flows from our judicial interpretive, as opposed to legislative, function.

wherein Congress amended these acts but did not disturb decisions ruling punitive damages unavailable under sections 504 and 202. Noting the assumption, made in Franklin and Cannon, that Congress legislates in light of then-prevailing judicial interpretations, the Sixth Circuit concluded "[t]he only inference of congressional intent that can be drawn from [the amendments] is that Congress intended § 504 remedies to remain *in statu quo–i.e.,* no punitive damages." Id. at 791.

This reasoning, however, misapplies the Supreme Court's methodology in Franklin and also undermines basic principles of statutory construction. Franklin first requires the determination of what remedies a statutory cause of action afforded at its enactment. It then permits reference to subsequent amendments only to see whether Congress later altered that initial understanding. This comports with the general rule that a statute adopts its meaning at the time of its enactment, and not at some later point by negative inference. In this case, because sections 504 and 202 draw their remedies from Title VI, the inquiry must start with the enactment of Title VI in 1964. As discussed above, Cannon and Franklin compel the conclusion that punitive damages were available as a remedy to a private cause of action under Title VI in 1964, and it is that assumption which provides the baseline against which subsequent amendments must be gauged. Therefore, the 1986, 1987 and 1991 amendments must be read as having not affected the status quo–that punitive damages are available under sections 504 and 202. To draw a contrary conclusion from those amendments would be to hold that Congress' understanding of section 504 in 1986 and 1987, and its understanding of sections 504 and 202 in 1991 trumped Congress' intent regarding those statutes when they were originally enacted, and in this way retroactively amended them. See Brown & Williamson Tobacco Corp. v. FDA., 153 F.3d 155, 167 (4th Cir. 1998) (noting that a statute's intent at the time of its enactment governs over subsequent congressional understandings) (citing MCI Telecomm. Corp. v. AT&T, 512 U.S. 218, 222 (1994)), aff'd, 529 U.S. 120 (2000).

Despite our conclusion, the Sixth Circuit's concerns are hardly misplaced. When Congress enacted the Rehabilitation Act and at the time of the subsequent amendments, courts generally agreed Title VI and section 504 did not afford monetary damages, and were in near unanimity that they did not permit punitive damages.[9] However, the governing statutes and precedents in this case operate as a one-way ratchet: once a cause of action is discovered, it automatically entitles a plaintiff to all appropriate remedies; and that finding then extends those remedies to all other interrelated statutes. This now precludes consideration of what Congress intended through consideration of these earlier court decisions.

This tension becomes particularly clear in the context of the 1991 Civil Rights Act. The product of extensive compromise between President George Herbert

---

[9]See, e.g., Americans Disabled for Accessible Pub. Transp. v. Skywest Airlines, Inc., 762 F. Supp. 320 (D. Utah 1991) (finding no punitive or compensatory damage remedy under section 504); Doe v. Southeastern Univ., 732 F. Supp. 7 (D.D.C. 1990) (limiting section 504 to equitable remedies); Robinson v. University of Pa., No. 87-2476, 1988 WL 120738 (E.D. Pa. Nov. 8, 1988) (holding neither punitive nor compensatory damages available under Title VI); Singh v. Superintending Sch. Comm., 601 F. Supp. 865 (D. Maine 1985) (permitting compensatory remedy but not punitive remedy under Title VI); Moreno v. Texas S. Univ., 573 F. Supp. 73 (S.D. Tex. 1983) (finding no private cause of action for compensatory or punitive damages under Title VI); Rendon v. Utah State Dep't of Employment Sec. Job Serv., 454 F. Supp. 534 (D. Utah 1978) (same). But see Neighborhood Action Coalition v. City of Canton, 882 F.2d 1012 (6th Cir. 1989) (permitting Title VI action for compensatory and punitive damages to continue without addressing their availability); Hutchings v. Erie City & County Library Bd. of Directors, 516 F. Supp. 1265 (W.D. Pa. 1981) (permitting damages remedies under section 504 in suit where plaintiff sought punitive damages); Patton v. Dumpson, 498 F. Supp. 933 (S.D.N.Y. 1980) (finding section 504 to afford compensatory damages); Gilliam v. City of Omaha, 388 F. Supp. 842 (D. Neb. 1975) (recognizing action for monetary damages under Title VI), aff'd on other grounds, 524 F.3d 1013 (8th Cir. 1975). Since Franklin, courts have begun to re-evaluate these holdings. See, e.g., Burns-Vidlak v. Chandler, 980 F. Supp. 1144 (D. Haw. 1997) (finding punitive and compensatory damages available under sections 504 and 202).

Walker Bush and Congress, that Act amended the ADA and the Rehabilitation Act to permit limited punitive damages. Specifically, it permitted employees suing under section 107(a) of the ADA and section 501 of the Rehabilitation Act to recover compensatory and punitive damages subject to statutory caps ranging from $50,000 to $300,000. 42 U.S.C. § 1981a. It did not, however, affect sections 504 or 202. The text and history of the 1991 Act suggest Congress intended to expand, and not to contract, the available remedies. Congress provided that a "complaining party may recover compensatory and punitive damages," using broadening, and not limiting language. 42 U.S.C. § 1981a(a)(2). Legislative history corroborates this interpretation. See, e.g., H.R. Rep. No. 102-40(I & II) (1991), reprinted in 1991 U.S.C.C.A.N. 549, 673 (discussing punitive damage provisions as an expansion of remedies). The following year, those who had pushed for the inclusion of punitive damages in the 1991 Act introduced a bill to remove its damages caps. The proposed bill would have deleted 42 U.S.C. § 1981a(b)(3), which contains the caps, but would not have removed the language authorizing punitive and compensatory damages, suggesting that even then, they considered the new language necessary to create a punitive damage remedy under the acts. See Equal Remedies Act, S. Rep. No. 102-286 (1992), 1992 WL 113471 (Leg. Hist.); see also Kolstad v. American Dental Ass'n, 527 U.S. 526, 534 (1999) ("With the passage of the 1991 Act, Congress provided for additional remedies, including punitive damages, for certain classes of . . . violations.").

Applying the Supreme Court's reasoning in Franklin turns this understanding on its head. Cannon, Rodgers and Miener postulate the creation of a private cause of action in Title VI in 1964. Under Franklin we are to assume that action to have provided all remedies. Absent any subsequent contrary instruction, we are to assume those remedies to remain available under sections 504 and 202 today. We therefore rule, albeit not with great satisfaction, that these sections permit an award of punitive damages. Perhaps our parting ways with our sister circuit will prompt the Supreme Court or Congress to inject additional clarity into this area.

Our analysis thus far does not entirely conclude this matter, as an award of damages must be "appropriate" in a specific case.[10] District courts must undertake an independent review of the evidence to determine whether it supports punitive damages. Grabinski v. Blue Springs Ford Sales, Inc., 203 F.3d 1024, 1025 (8th Cir.), cert. denied, 121 S. Ct. 70 (2000); accord Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal Inc., 492 U.S. 257 (1989). The defendant's conduct must be shown to have been "motivated by evil motive or intent, or . . . reckless or callous indifference to the federally protected rights of others." Smith v. Wade, 461 U.S. 30, 56 (1983); see also Kolstad, 527 U.S. 526 (discussing punitive damages scheme under 42 U.S.C. § 1981a). Punitive damages may also not be excessive. Watkins v. Lundell, 169 F.3d 540, 545 (8th Cir.), cert. denied, 528 U.S. 928 (1999). We have a subsequent obligation to review the district court's finding. At oral argument, Gorman's counsel admitted this to be the case and conceded that the district court did not do so, as it found punitive damages precluded as a matter of law. The facts in this case were hotly contested. We therefore remand for consideration of this point.

IV.

The Police Board next appeals whether Gorman is a qualified individual with a disability under the ADA. The Police Board argues that while at the time of trial, our law clearly established that disability should be gauged without reference to corrective devices, subsequent Supreme Court decisions have required an individualized assessment of disability including consideration of available corrective

---

[10]The Moreno court also argued that given the legislative and judicial backdrop, punitive damages were not "appropriate" as required by Franklin. Moreno, 99 F.3d at 791-92. We do not think the word "appropriate" to have been writ so large, and do not think the Court intended to create an escape hatch for all foregoing judicial interpretations. In his concurring opinion, Justice Scalia opined that given an action's implied nature, implied limitations on remedies ought also be considered. Franklin, 503 U.S. at 77-78 (Scalia, J. concurring in the judgment). Justice Scalia's comments underscore the breadth of the Court's holding.

devices.  See, e.g., Murphy v. UPS, Inc., 527 U.S. 516 (1999); Sutton v. United Airlines, Inc., 527 U.S. 471 (1999).  It seeks a remand to litigate this issue.

This argument is well off the mark.  In Sutton, the Court concluded that a person with severe myopia, whose vision could be corrected with eyeglasses to the point that the disability did not severely impede a major life activity was not a qualified individual.  527 U.S. at 481-83.  Gorman's wheelchair permits him some mobility, but hardly replaces his legs.  Moreover, the events challenged in this lawsuit center largely on his removal from the wheelchair and placement in the back of a police van, where he had no corrective device.  No corrective device–no issue.  We see little need to further pursue this question.

V.

The Police Board next raises two challenges to the jury instructions.  The Board asserts that the jury was not instructed as to each element of an action under sections 504 and 202, and also objects to an instruction that the Board had an obligation to provide "safe" transportation.  A jury instruction must, when taken as a whole and viewed in light of the evidence and applicable law, fairly and adequately submit the issues in the case to the jury.  Horstmyer v. Black & Decker, (U.S.), Inc., 151 F.3d 765, 771 (8th Cir. 1998).  Where a party fails to object to an instruction before the district court, we will review only for plain error.  Id.

In instruction 16, the district court instructed the jury that liability would lie under the Rehabilitation Act and the ADA upon proof of all the following elements:

> **First**, that the defendants failed to provide plaintiff appropriate transportation that reasonably accommodated his disability after he was arrested, and

-16-

**Second**, that as a direct result of the defendants' failure, plaintiff sustained damages.

The district court then instructed the jury in its instruction number 17 that "for purposes of Instruction No. 16, making a 'reasonable accommodation' for the plaintiff means making modifications to the defendants' practices for transporting the plaintiff after he was arrested so that he would be transported in a manner that was safe and appropriate consistent with his disability."

The Board failed to object at trial to the form of instruction 16, as given at trial. In fact, the Board agreed to its text and stated an intention to not object. We will therefore reverse only for plain error. We have previously held that in order to prevail under section 202, a plaintiff must prove that "1) he is a qualified individual with a disability; 2) he was . . . denied the benefits of a public entity's services . . . ; and 3) that such . . . denial. . . was by reason of his disability." Layton v. Elder, 143 F.3d 469, 472 (8th Cir. 1998). Such language, however, is not sacrosanct. Rather, an instruction must fairly and accurately submit the issue in light of the evidence and the law. Horstmyer, 151 F.3d at 771. In this case, the court's instructions resulted from lengthy negotiations between the court and the parties during which the parties agreed to drop certain elements from the instructions. Moreover, the language used fairly captures the elements of the actions. Section 202 requires reasonable transportation modifications if necessary. The court's instruction that damages flow from a failure to reasonably accommodate a disability implicitly requires a finding of denial and disability. The instruction similarly covers the essential elements of section 504. In light of the facts of this case and the language used, we sustain the instruction given.[11]

---

[11]In the future, the district court should separate out instructions under different acts and more carefully parse elements, for clarity on appeal.

The Board also takes issue with the district court's use of the word "safe" in instruction 17 as an incorrect statement of the law, and expresses the fear that it required the Board to insure the safety of future detainees. The district court quoted the word "safe" from our prior opinion in this case. See Gorman, 152 F.3d at 913. We agree with the Police Board that in Gorman we did not impose an obligation of providing "safe" transportation. We also, however, do not think that the district court's instruction warrants the interpretation given it by the Police Board. The instruction required transportation safe and appropriate *consistent with Gorman's disability*. This seems the essence of a reasonable accommodation–the police cannot reasonably accommodate a disabled detainee by placing him in a position where, by virtue of his disability, he is left helpless. The district court did not require the Police Board to insure Gorman against other harms, such as a crash on the way to the station or a self-imposed injury. On this reading, we approve the instruction.

## VI.

The Board also challenges the district court's denial of its motion for a new trial, on the basis that the verdict was against the weight of the evidence, along with various evidentiary rulings. After reviewing the record we affirm the district court on these points.

We remand to the district court for further proceedings consistent with this opinion.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-18-